State *v.* Scheele.

<hr>

THE STATE *vs.* JACOB SCHEELE.

Fairfield Co., March T., 1889. PARK, C. J., CARPENTER, PARDEE, LOOMIS and BEARDSLEY, Js.

Where a person in resisting the attempt of another to enter his house for the purpose of unlawfully arresting him, unnecessarily kills the assailant, the homicide is unjustifiable, but if committed solely for the purpose of defense, is manslaughter and not murder.

But where the slayer had a premeditated intent to kill the assailant, which intent was the result of previous hatred and malice and was based in some degree upon a desire for revenge for past injuries, and not wholly upon the necessity of protection from present danger, the killing is murder in the first degree.

Upon an indictment for murder in shooting an officer who was approaching the prisoner's house and who had a process for his arrest for a misdemeanor, the judge, having instructed the jury that "a specific, willful, deliberate intent to kill would constitute express malice aforethought," proceeded with his charge as follows:—"If you find that the deceased

was approaching the house for the purpose of breaking in to arrest the accused in an illegal manner, and the accused under the circumstances had reason to believe and did believe that the deceased was about to carry such purpose into immediate execution, he had a right to make all reasonable resistance; and if you find that, without saying a word by way of warning, and while the deceased was at some distance from the house and had made no actual assault upon it, the accused shot at and killed him, such an act would not be a reasonable exercise of his right to resist, and such killing, if done with express malice, as I have explained it, would be murder in the first degree; otherwise, if without express malice. It is for you to say, from all the evidence, what were the facts, and whether, under all the circumstances, what the accused did was reasonable and proper and done without express malice; and you are to judge this man as the circumstances appeared to him at the time." Later in his charge the judge said:—"If the killing, under the circumstances claimed by the defense, was done on account of the provocation, in a sudden heat of passion caused by such provocation, and not of his express malice and out of the hatred of his heart, it would reduce the crime to manslaughter; but if on the other hand, he had hatred in his heart towards this man and intended to kill him, and the killing was the result of deliberate, willful and premeditated intent, and not the result of this provocation, it would be murder." Held that, taking the whole charge together, the jury could not have failed to understand that if the killing was done in defense of house, person or liberty from the apprehended assault, and without other motive, but under such circumstances as to be an unreasonable exercise of the right of defense, the prisoner would be guilty of manslaughter only. (Two judges dissenting.)

[Argued March 27th—decided April 8th, 1889.]

INDICTMENT for murder in the first degree; in the Superior Court in Fairfield County. The case was tried to the jury, on the plea of "not guilty," before *Torrance, J.* Verdict, "guilty of murder in the first degree," and appeal by the defendant for error in the charge of the court and in the refusal to charge as requested. The case is fully stated in the prevailing opinion, and the points made by counsel in argument are fully r sented in the prevailing and dissenting opinions.

*D. B. Lockwood* and *I. J. Curtis*, for the appellant.

*S. Fessenden*, State's Attorney, and *J. C. Chamberlain*, for the State.

CARPENTER, J. The facts of this case are stated in the finding as follows:

Upon the trial of this cause to the jury, it was shown by uncontradicted evidence that on the 25th day of January, 1888, at New Canaan in Fairfield County, Scheele, the prisoner, shot and killed one Louis Drucker of said New Canaan; that at the time of the killing Drucker had in his possession a warrant for the arrest of Scheele, for the crime of violation of the laws relating to the sale of spirituous and intoxicating liquors; that Scheele was in his own house, with the doors and windows fastened against the entrance of Drucker, and that Drucker, having a short time before tried to enter the house, was with his assistants on the land of the prisoner, and in the act of approaching the house, for the purpose of executing the warrant.

The State claimed, and offered evidence to prove, that at the time Drucker was a lawfully elected and qualified constable of New Canaan; that on said day he went to the house of Scheele, for the purpose of lawfully arresting him upon the complaint, which he then had in his hand for service; that he tried the doors of the house and found them locked, and that some words passed between Drucker and the prisoner; that Drucker then went to the village of New Canaan for assistance, and returned to the house in about fifteen minutes, and on approaching within nineteen feet of the house, the prisoner, without warning Drucker or saying a word as to his intention, fired a gun loaded with shot at Drucker, killing him instantly.

The State further claimed, and offered evidence to prove, that prior to the killing the prisoner had a quarrel with Drucker, and had a bitter feeling towards him, and had made threats against him and planned to murder him; and in proof thereof, among other witnesses, offered as a witness Charles Seacord, who testified that on the 25th day of December, 1887, while in his custody under arrest, the prisoner asked him where the " dàmned Jew " was, meaning Drucker, saying "I'll fix him so he will stay fixed, and he will not be dogging me around any more; " also Charles

Griebel, who testified that two weeks before the shooting Scheele said to him that "Drucker, Hawley and others were troubling him, and that if he could get rid of these men he would be willing to die for it;" also Frank F. Sanford, who testified that he was at Scheele's house on Christmas day, 1887, and while there and while Drucker was searching his house on a search-warrant, Scheele wanted to go to his room, saying that he "had something there, which if he had it, he would rip him (Drucker) up," and that he also said, "what they want in New Canaan was three men like them in Chicago;" and also Ezra S. Hall, who testified that after the killing, when he told Scheele that he had killed Drucker, he replied, "I don't care a damn, I am glad of it."

The State also, for the purpose of showing deliberation and premeditation, offered as a witness Mary Banzhalf, who testified that five minutes after Drucker had left the house the first time, Scheele began to nail up the windows of his house, and that he broke pieces of glass out of one of the windows in the second story, and that she saw a hand pull out the broken glass; and the State also offered evidence that Scheele fired the gun out of the window so broken.

The defense claimed, and offered the testimony of the prisoner to prove, that Drucker intended, if necessary, to enter the house by force, and to take him, dead or alive, and that he believed that he so intended to do. The defense also claimed, from the testimony of certain witnesses for the State, that Drucker when approaching Scheele's house the second time, intended and was about to break into the house unlawfully and arrest Scheele in an unlawful manner, and that Scheele so believed, and was justified in so believing. The State denied this claim, and from the whole evidence claimed that Scheele neither believed, nor was justified in believing, that Drucker intended or was about to break into the house unlawfully or to make the arrest unlawfully.

The defense also claimed, and offered evidence to prove, that the prisoner was of unsound mind at the time of the killing; that immediately after killing Drucker he attempted to kill himself, by firing four small bullets from a pocket

pistol, one into his head and three into his body; and by such action, and his conduct before and at the time of the shooting, claimed to have proved that he was incapable of forming a deliberate intent to kill; at least, incapable of forming an intent to commit the crime of murder in the first degree. The State claimed, and offered evidence to prove, that the prisoner was of sound mind at the time of the commission of the crime, and that he was capable of forming a deliberate and premeditated intent to take the life of Drucker, and also that Drucker had no intention to enter the house by force, or to make the arrest of the prisoner in any other than a lawful manner, and that there was nothing in the conduct or language of Drucker to indicate any such intention, or to induce such belief on the part of Scheele, and that Scheele did not in fact believe it.

Upon the evidence so offered the State claimed that Scheele willfully, deliberately and premeditatedly, and of his malice aforethought, killed Drucker, and thereby committed the crime of murder in the first degree.

The prisoner was convicted of murder in the first degree, and appealed to this court. The reasons of appeal relate to the charge to the jury and the refusal of the court to charge as requested.

The part of the charge complained of in the second reason of appeal is as follows:—

"If you find that the deceased entered upon said land and was approaching said house for the purpose of breaking into the house to arrest the accused in an illegal manner, and the accused, under the circumstances, had reason to believe, and did believe, that the deceased was about to carry such purpose into immediate execution by an assault upon the house, the accused had the right to make all reasonable resistance to prevent the deceased from executing said purpose; and if you find that, under the circumstances, the accused, without saying a word to the deceased by way of warning or otherwise, and while the deceased was at some considerable distance from the house, and had made no actual assault upon it, as claimed by the State, shot at and

killed him, such an act would not be a reasonable exercise of the right of the accused to resist under such circumstances, and such killing, if done with express malice aforethought, as I have explained it, would be murder in the first degree; but if done without such express malice aforethought, but with implied malice, would be murder in the second degree. It is for you to say, as a question of fact, from all the evidence in the case, what were the facts and circumstances under which the killing was done, and whether, under all the circumstances, what the accused did was reasonable and proper, and done without express malice; and you are to judge this man as the circumstances appeared to him at the time."

Counsel for the defense claim " that, on the facts assumed by the court to be proved, the instructions given were not correct and adapted to the issue, or sufficient for the guidance of the jury in the case before them; for while the court charges the jury that the action of the prisoner in firing upon the deceased nineteen feet from the house, and without warning, is an unreasonable exercise of his right of defense, the court fails to say that if the shooting was done in defense of house, person or liberty from an unlawful assault, or one about to be made, and from no other motive, the prisoner would be guilty of manslaughter."

This claim assumes, what the record will not warrant, that the evidence was such as to require a charge upon the theory that the prisoner's sole motive was to defend his house and person by repelling an attack which he supposed was about to be made upon them by the deceased; for there was evidence, and pretty strong evidence, that the prisoner was actuated by express malice. If so there was also the motive of revenge or the gratification of malice. The criticism is based upon the theory that it was the duty of the court to ignore all evidence tending to prove such a motive and submit this part of the case to the jury on the motive of defense alone. The case did not call for that; therefore we think the court properly submitted to them the whole question of motive, whether of defense or of malice.

If there was express malice, there were necessarily motives apart from those of self-protection. It is conceded that motives of defense, in order to avail the prisoner, must have been the only ones; for counsel certainly do not go so far as to claim that, if there was occasion to defend person or property or both, the prisoner might avail himself of that occasion to deliberately and of his express malice take the life of the assailant for other reasons, and incur no greater risk than the penalty for manslaughter.

"And such killing, if done with express malice afore-thought, as I have explained it, would be murder in the first degree." This sentence is objected to as telling the jury in effect that the shooting not being justifiable, the prisoner is guilty of murder in the first degree. We do not think that that expresses fairly the meaning of the charge, the whole of which is to be taken together in determining its meaning. The court very fully and fairly explained malice to the jury, and the distinction between express and implied malice; and also an unlawful killing without malice; and the jury was distinctly told repeatedly that express malice was essential to the crime of murder in the first degree. We cannot interpret the charge as giving the jury to under-stand that an intent to take life unlawfully was necessarily equivalent to express malice, or that any form of killing without malice would be murder. It seems impossible that the jury could have received the impression that the killing, if without malice, could be murder in the first degree. The jury could not fail to understand that if the shooting was done in defense of house, person or liberty from the appre-hended assault, and without other motives, consequently without malice, but under such circumstances as to be an unreasonable exercise of the right of defense, the prisoner would be guilty of manslaughter only.

But if it be conceded that the defense was entitled to a charge which would or might take from the jury the ques-tion of malice, and require them to pass upon the case upon the theory that malice was wholly wanting, then we think that the jury were told, in substance, all that the defense

State *v.* Scheele.

now claims that they should have been told, in the court's response to the defendant's requests. But aside from that, the jury were not required to take that view of the case, or to consider it in that aspect, for they found, and must have found, that the killing was willful, deliberate, and premeditated; or, as the court expressed it, "of his express malice and out of the hatred of his heart."

It is also claimed that the court erred in stating as a matter of law, that under the circumstances of the case there outlined, the killing would be an unreasonable exercise of the right of defense. But counsel in their requests and in their arguments admit that it was an unreasonable exercise of the right of defense; for they claim that the offense was manslaughter; whereas if it had been a reasonable exercise of the right the act was justifiable and not a crime at all. Moreover, the opinion expressed by the court was based on the assumption that the facts as claimed by the State were proved, and on that assumption was obviously correct. Again: the court submitted it to the jury "to say from all the evidence in the case what were the facts and circumstances under which the killing was done, and whether, under all the circumstances, what the accused did was reasonable and proper and done without express malice."

The third reason of appeal arises upon the court's response to the prisoner's seventeenth request to charge the jury, which request and answer are as follows:

"If the jury find that the deceased was not in fact attempting to make a forcible and unlawful entry into the dwelling house of the prisoner, yet if they are of opinion that the deceased and his party were on the point of unlawfully breaking in, or likely to do so, and under such circumstances as to raise a reasonable belief in the prisoner's mind that such was their intent, and that imminent danger of great bodily harm was threatened him, and under this belief he fired the shot, such circumstances are a sufficient provocation to make the killing manslaughter and not murder." To this the judge responded:—"I charge that, gentlemen, with this limitation: if this killing, under the circumstances here

State v. Scheele.

claimed, was done on account of the provocation, in a sudden heat of passion caused by such provocation, and not of his express malice and out of the hatred of his heart, that is the law. It would, under such circumstances, reduce the crime to manslaughter. But if, on the other hand, under the circumstances stated in this request, he had hatred in his heart toward this man, and intended to kill him, and the killing was the result of deliberate, willful and premeditated intent, and not the result of this provocation, it would not reduce the crime to manslaughter at all, but in such case would be murder."

It will be observed that one of the assumed facts on which this request is based is, that there was a reasonable belief in the prisoner's mind that he was in "imminent danger of great bodily harm." That claim need not be considered in this connection, because that was the subject of a distinct request, and the court charged as requested. We quote the request and charge.

" If the jury find that the prisoner was occupying a dwelling house, and resisting an unlawful attempt to enter his house by force, and fired the shot under such circumstances as would produce in his mind a reasonable belief of imminent danger of great bodily harm or death, the killing of his assailant is not criminal, but excusable." To which the judge responded :—" If you find such a state of facts to exist in this case, gentlemen, that is the law. If you find that this man, under the circumstances, within the language of this request, was occupying his dwelling house, and resisting an unlawful attempt to enter the house by force, and that he fired the shot under such circumstances as would produce in his mind—judging him by the circumstances as they appeared to him—a reasonable belief of imminent danger of great bodily harm or death, the killing of his assailant is not criminal, but excusable."

We return now to the seventeenth request. There can be no objection to the court's response to that. The jury were properly required to find whether the homicide was the result of passion and excitement caused by the provoca-

tion, or ·was the result " of his express malice, and out of the hatred of his heart." Of course the jury found the latter to be true.

It is not a fair interpretation of the charge to say that the jury were told that if they found "that this man was defending his house, person or liberty and acted with any deliberation whatever, and was not in a sudden heat of passion, then they must find him guilty of murder." There is another side to it. This particular portion of the charge—and in that it agrees with the tenor of the whole charge—instructed the jury to inquire whether "the killing was the result of deliberate, willful and premeditated intent, and not the result of this provocation;" and that if it was, "it would not reduce the crime to manslaughter at all, but in such case would be murder."

The eighteenth request, and the response thereto, were as follows:

"If the jury find that the deceased was not in fact attempting to make a forcible and unlawful entry into the dwelling house of the prisoner, yet if they believe that the deceased and his party were on the point of breaking in, or likely to do so, and under such circumstances as to raise a reasonable belief in the prisoner's mind that such was their intent, and that he would be powerless to prevent their entrance by the exercise of a less degree of force than that applied, or such a degree of force less promptly applied, such circumstances are a sufficient provocation to make the killing manslaughter and not murder." The instruction given was as follows: "Gentlemen, if you find the facts as here claimed, the law is so; with the limitation stated under the other request, that under all the circumstances the shooting was the result of a sudden heat of passion arising from this provocation; that the prisoner under all the circumstances had reason to be provoked; that as he looked at it, as the circumstances appeared to him, he was suddenly carried beyond a control of his will by an excess of passion, caused by such provocation, and that the shooting was not the result of malice."

Here the defense called attention to the facts and circumstances tending to prove a provocation, and on which the request was based, and asked the court to consider them without regard to the evidence tending to prove malice, and to say that such circumstances are a sufficient provocation to make the killing manslaughter and not murder. It was not the duty of the court so to charge without qualification or limitation, and such a charge would not have been adapted to the facts and claims of the parties. Here too the jury were properly told in substance to inquire whether the killing was with or without malice.

The prisoner's counsel, under the fourth head of their brief, enlarge upon the objections raised in the second and third heads. Here they admit that the law as given by the court may be a sufficiently correct general statement, but claim that it fails to be correct when applied to a case like this, where a homicide is claimed to have been committed in defense of house, liberty or person.

The objections made by the defense, and the whole course of the argument, seem to imply a claim that if the element of defense of property or person was involved in the act, the offense, as matter of law, could not be greater than manslaughter, no matter how strong the evidence might be of express malice. That cannot be the law. It was for the jury to say whether there was malice and consequent murder.

In support of their claim counsel cite *Commonwealth* v. *Carey*, 12 Cush., 246. In that case the prisoner had broken into the ticket office of a railroad company, but there was no evidence that he had stolen anything. The deceased, who was a constable, caught him in the ticket office and arrested him. The prisoner attempted to escape and was pursued by the deceased. The prisoner turned around with a pistol in his hand and told the deceased to go back or he would shoot him. The deceased stopped, but did not go back, and the prisoner shot him. On the sole ground that the deceased had no right to arrest him without a warrant, the crime he had committed not being a felony, the court held that the homicide was manslaughter and not murder.

SHAW, C. J., said: "The court were of opinion, and proposed to instruct the jury, that if a prisoner is unlawfully arrested, and if in resisting the arrest, or attempting to escape he takes the life of the person so arresting him, although the act is not justifiable and amounts in law to a criminal homicide, yet it is not homicide with malice aforethought, which is necessary to constitute murder, but it will, in contemplation of law, be manslaughter. This was a principle somewhat technical, but yet well established by law; that although in many cases, and even in the present case, if the evidence already offered should remain uncontroverted, the act might be done under such circumstances of deliberate cruelty as would equal or surpass, in point of atrocity and moral turpitude, many cases recognized as murder, yet the prisoner must be tried by the rules of law and not by the aggravation of the offense as tried and tested by another and different standard."

Thus the question whether it was murder or manslaughter depended upon the common law distinction between felony and minor offenses, a distinction without much significance at the present day, and one with which, presumptively, both the prisoner and his victim were not familiar instead of upon the facts attending the homicide and the animus of the prisoner. Murder was then, (in 1853,) but one offense, having been divided into the first and second degrees five years later. As it was either a capital offense or manslaughter, we can appreciate the willingness and even the desire of the court to regard it as the lesser offense. But aside from this, there was no evidence of previous ill-will or animosity toward the deceased; and the prisoner gave him warning, thus indicating a desire to escape without taking life; while in this case there was evidence of express malice, indicating a desire to take life, and the act was perpetrated without caution or warning. On the whole we can hardly regard that case as a controlling authority.

In *State* v. *Patterson*, 45 Verm., 308, the court treats mainly of justifiable homicide in defense of one's dwelling house. The question of manslaughter in such cases is indeed

State *v.* Scheele.

spoken of; but we do not find in that case any authority for the proposition that, if an officer is about to enter a house unlawfully, in the daytime, for the purpose of arresting the occupant for a misdemeanor, and the occupant, out of the hatred of his heart and of express malice kills the officer, the crime, as matter of law, is manslaughter only. The law of self-defense, or the defense of one's domicil, does not require the giving to evil minded persons an opportunity to take the life of another on such easy terms.

In *Brooks* v. *Commonwealth*, 61 Penn. St., 352, a theft was committed in a house. Soon after the owner and his brother pursued the thieves and overtook them. In attempting to arrest them the brother was killed. The prisoners were indicted for murder. On the trial the court was asked to charge that the pursuers, not being public officers, had no authority to arrest, the arrest was illegal, and the killing was not murder but manslaughter. The court refused so to charge. It was held not to be error, as so to charge would have taken the whole case from the jury. The syllabus says:—" If the arrest had been illegal, it was still for the jury to determine whether the killing was without malice and arose from a sudden heat upon the arrest." In the course of the opinion the court says:—" An innocent man is unconscious of guilt, and may stand on his own defense. When assailed under a pretense which is false his natural passion rises, and he turns upon his assailant with indignation and anger. To be arrested without cause is to the innocent great provocation. If in the frenzy of passion he loses his self-control and kills his assailant, the law so far regards his infirmity that it acquits him of malicious homicide. But this is not the condition of the felon. Conscious of his crime he has no just provocation; he knows his violation of law, and that duty demands his capture. Then passion is wickedness and resistance is crime. Neither reason nor law accords to him that sense of outrage which springs into a mind unconscious of offense, and makes it stand in defense of personal liberty. On the contrary, fear settles upon his heart, and when he uplifts his hand

the act is prompted by wicked hate and the fear of punish-
ment. . . . . A sense of guilt cannot arouse honest indigna-
tion in the breast, and therefore cannot extenuate a cruel
and willful murder to manslaughter."

That case in some of its features resembles this; and
especially in respect to the all-important fact that there is
evidence of express malice, the existence of which, under the
charge of the court, has been found by the jury. Of course
the observations in that case have no application to a case
where an innocent man is being lawfully arrested. Nor do
they apply in full force to the case at bar; but they are
applicable to some extent. The officer was attempting to
arrest the prisoner for a violation of the law relating to the
sale of spirituous liquors. Whether guilty or innocent it
was his duty as a law-abiding citizen to submit to the arrest.
Men generally, uninfluenced by passion, would have done
so. Had he done so, he would have been discharged as
innocent or have received a comparatively light punishment
for his offense, and no serious consequences would have
resulted. His house would have received no harm, and his
life and the life of the officer would have been saved. True,
he was not bound to submit to an illegal arrest. He had a
strict legal right to fortify himself in his castle, and to resist
an attack upon it by all lawful means. If resistance by
lawful means results in death it is excusable homicide; if by
unlawful means, and without malice, it is manslaughter;
if by unlawful means, prompted by hate and malice, and
death in cool blood is intended, it is murder in the first
degree. No man who is being wronged may take that occa-
sion to deliberately murder the wrongdoer.

In *Rafferty* v. *The People*, 69 Ill., 111, the prisoner was
being arrested for violating a by-law of the city of Chicago, on
a warrant signed in blank by a magistrate, and subsequently
filled out by a sergeant of police, who gave it to a policeman
to serve. The officer and the deceased attempted to arrest
the prisoner, when the homicide occurred. It was held that
the warrant was void, and the crime manslaughter only.
The court says:—"His name was inserted in the warrant

by the sergeant of police, after it had been delivered to him by the magistrate, without authority.   These facts, if found by the jury, should determine the character of the homicide to be manslaughter, *unless the proof showed express malice towards the deceased."*

The existence of proof of express malice is what distinguishes this case from that.

The same case was subsequently before the court, (72 Ill., 37,) and a portion of the syllabus reads as follows:—

"4. If an officer be resisted and killed by one whom he is illegally attempting to arrest, and it appears that the party who does the killing was actuated by previous or express malice in so doing, such killing is murder, notwithstanding the illegality of the attempted arrest."

"7. When a party procures a weapon for the express purpose of resisting an arrest, whether legal or illegal, by a particular officer or by one of a particular class of officers, and such officer attempts to arrest him, and, before any violence is done or offered to him, he kills such officer with the weapon thus provided, the jury will be justified in finding that he was actuated by previous or express malice, and the killing is murder, notwithstanding the attempted arrest was illegal."

On the trial then under review were two important questions of fact:—1. Was the deceased participating in the attempted illegal arrest?  2. Was the prisoner actuated by express malice ?   The court in its opinion says:—"But there is another view of the evidence which would entirely override the questions of illegal arrest or O'Meara's participation in it, and that was the evidence of previous or express malice. Only three days previously, the prisoner declared, in substance, that no Bridgeport policeman should arrest him while he had a pistol.   It appears that, although finding him in the saloon was a matter of pure accident, he was already prepared with the very weapon alluded to in his threat. These officers were Bridgeport policemen, and it appears that he did not use it upon the deceased merely because he was preventing his egress from the saloon, but when he had

shot him through the breast, then, without offering to go out of the door, he instantly turned around and fired two shots at Scanlon, who was back of him, and had no agency in preventing egress from the room, either by personal violence or constructively by guarding the door."

In the present case the prisoner testified that he believed that Drucker intended, if necessary, to enter the house by force, and that he intended to take the prisoner "dead or alive;" and that he believed that he intended so to do. Whether there was other evidence tending to prove that the officer intended great bodily harm we know not; but, as we have seen, the question whether the prisoner was in imminent danger of great bodily harm, or death, or that he believed that he was, was submitted to the jury, and the verdict was an emphatic negative answer. The prisoner therefore cannot be regarded as defending his life or himself against great bodily harm, but simply as defending his house against an unlawful entry by parties whom he knew, in the daytime, for the purpose of executing a lawful warrant, and his person against an unlawful arrest by reason of such unlawful entry.

If, in making such defense, the prisoner had not intended to kill the deceased, but had, by an unreasonable defense, unintentionally killed him, the crime would have been manslaughter. If the prisoner had warned him of his intention, had commanded him to desist, had given him a reasonable opportunity to desist before shooting, the offense could hardly have been regarded as greater than manslaughter. Now take the case as it was. There was evidence tending to prove that, prior to the killing, the prisoner had a quarrel with Drucker, and had a bitter feeling towards him, had made threats against him, and had planned to murder him. He asked one witness where the "damned Jew" was, meaning Drucker, saying—"I'll fix him so he will stay fixed, and he will not be dogging me around any more." About two weeks before the shooting he said to another witness, that "Drucker, Hawley and others were troubling him, and that if he could get rid of these men he would be willing to die

for it." On one occasion, while Drucker was searching his house on a search-warrant, he wanted to go to his room, saying he "had something there, which if he had it he would rip him up." He also said—"What they want in New Canaan was three men like them in Chicago." Another witness testified that five minutes after Drucker left the house the first time, the prisoner began to nail up the windows of his house, and that he broke pieces of glass out of one of the windows in the second story. The State also claimed to have proved that he fired the gun from the window so broken.

Now, suppose that the jury believed this evidence, as they must have done; is it possible that the offense in law, by reason of the defense of his house and of his person from such unlawful arrest, is manslaughter only? Is that the protection which the law throws around its officers? May any one who has murder in his heart and desires to kill an officer, and who is about to be arrested for a misdemeanor, fortify himself in his dwelling house, and on the approach of the officer, without notice or warning shoot him, "of his express malice and out of the hatred of his heart."

A majority of the court think that the case was properly submitted to the jury and therefore find no error.

In this opinion PARK, C. J., and LOOMIS, J., concurred.

PARDEE, J., dissenting. The accused offered evidence tending to prove, and claimed that he had proved, that the deceased intended to use sufficient force to effect an entrance into the house and take him dead or alive; that he so believed; also that he believed, and had reason for believing, that the deceased intended, and was about to effect, an unlawful entrance into the house and unlawfully arrest him.

These claims upon the part of the accused were supported by admissible testimony, which testimony it was within the legal power of the jury to believe, if they saw fit so to do. Therefore it was a possible fact in the case that the deceased did so intend and the accused did so believe, and that his

action was wholly the result of such belief. And upon such possible fact he asked the court to instruct the jury as to his legal rights. The court charged the jury as follows:

" If you find that the deceased entered upon said land and was approaching said house for the purpose of breaking into the house to arrest the accused in an illegal manner, and the accused, under the circumstances, had reason to believe, and did believe, that the deceased was about to carry such purpose into immediate execution by an assault upon the house, the accused had the right to make all reasonable resistance to prevent the deceased from executing said purpose ; and if you find that, under the circumstances, the accused, without saying a word to the deceased by way of warning or otherwise, and while the deceased was at some considerable distance from the house, and had made no actual assault upon it, as claimed by the State, shot at and killed him, such an act would not be a reasonable exercise of the right of the accused to resist, under such circumstances, and such killing, if done with express malice aforethought, as I have explained it, would be murder in the first degree ; but if done without such express malice aforethought, but with implied malice, would be murder in the second degree. It is for you to say, as a question of fact from all the evidence in the case, what were the facts and circumstances under which the killing was done, and whether, under all the circumstances, what the accused did was reasonable and proper, and done without express malice ; and you are to judge this man as the circumstances appeared to him at the time."

If a person approaches the house of another with the intent to make an unlawful entrance by force and an unlawful arrest of the owner who is therein, the latter, having reason for believing such to be his intent, and that he is about to carry it into effect, may, for the sole purpose of preventing the execution of such unlawful intent, make resistance sufficient in degree and in time to prevent it. He is under no legal obligation to admit the unlawful intruder or flee from the house and permit him to effect an unlawful entrance. If the resistance is neither greater in

degree nor earlier in time than is necessary, and it results in the death of the assailant, it is justifiable homicide. And the slayer is to be judged as the circumstances really appeared to him at the moment.

If the resistance is unnecessarily great in degree or early in time, and therefore unreasonable, and therefore unlawful, and results in the death of the assailant, it is manslaughter. It is not murder either in the first or second degree, although the act is the result of premeditation and intent, if such premeditation and intent include nothing more than defense against the unlawful attack.

The court had previously instructed the jury that "to constitute murder in the first degree there must have been in the mind of the accused, at the time of the homicide, a deliberate, specific intent to kill, as this is an essential element of this crime. Such a specific, willful, deliberate intent to kill would constitute express malice aforethought."

In effect, therefore, the jury were instructed that if they should find this killing to have been the result of unnecessary force, or to have been unnecessarily soon, and therefore unlawful, it would be murder in the first degree, if it was done in coolness and with premeditation.

But, as a matter of law, it is possible for a man to be very cool, deliberate and determined in defending his house from an unlawful entry by force for the purpose of making an unlawful arrest of himself, even to the killing of the assailant, by force found to have been unnecessary in degree and time, and therefore unlawful, and yet not to be guilty of murder in the first degree. If the premeditation and intent are the result of previous hatred and malice, and are in any degree based upon revenge for past injuries, and not wholly upon protection from present danger, and if the present danger is used only as an opportunity for such revenge, the killing is murder in the first degree.

The jury are to determine in all cases as to the foundation of the premeditation and intent; also under instructions by the court as to the rule of law, to determine the fact as to

the reasonableness or unreasonableness of the force used in repulsion.

It cannot be said as a matter of law that under any and all circumstances the killing of such assailant, even without warning and when twenty feet distant from the house in his approach, was unreasonable and therefore unlawful, and therefore murder or manslaughter in some degree. It is for the jury to say, under instructions as to the rule of law, if a warning was necessary and if the killing at twenty feet distant was unnecessary.

In *Commonwealth* v. *Carey*, 12 Cush., 246, the facts were as follows: One Heywood, a constable, without a warrant, had arrested Carey for a misdemeanor, a degree of crime for which in Massachusetts a man could not be arrested by an officer without a warrant. Carey broke away from Heywood and ran off; Heywood pursued him. Carey knew he was a constable. Carey carried a pistol in his hand, which he once or twice pointed at his pursuer, but said nothing. After running about two hundred rods he made a stand, and told Heywood, who was within twenty feet of him, to go back or he would shoot him. Heywood stopped, but refused to go back. Carey took aim and fired. The ball took effect in the constable's abdomen, and he died in eighteen hours. SHAW, Ch. J., stated that " the court were of the opinion, and proposed to instruct the jury, that if a prisoner is unlawfully arrested, and if in resisting the arrest or attempting to escape he takes the life of the person so arresting him, although the act is not justifiable, and amounts to a criminal homicide, yet it is not homicide with malice aforethought, which is necessary to constitute murder; but it will in contemplation of law be manslaughter. This was a principle somewhat technical, but yet well established by law, although in many cases, even in the present, the act might be done under such circumstances of deliberate cruelty as would equal or surpass in point of atrocity or moral turpitude many cases recognized as murder; yet the prisoner must be tried by the rules of law, and not by the aggravation of the offense as tried and tested by another standard."

In *Commonwealth* v. *Drew*, 4 Mass., 395, PARSONS, Ch. J., said: " It is a rule of law that, where the trespass is barely against the property of another, not his dwelling house, it is not a provocation sufficient to warrant the owner in using a deadly weapon. * * * If any man under color or claim of legal authority, unlawfully arrest or actually attempt or offer to arrest another, and if he resist, and in the resistance kill the aggressor, it will be manslaughter."

In *Rafferty* v. *The People*, 69 Ill., 111, the marginal note is : " It is a general rule that when persons have authority to arrest or imprison, and while using the proper means for that purpose are resisted in so doing and killed, it will be murder in all who take part in such resistance. But if the officer exceed his authority the killing of the officer in such a case, by the person sought to be arrested, will not be murder but manslaughter only."

See also 3 Greenleaf on Evidence, (14th ed.) § 123 ; 1 Bishop on Criminal Law, (7th ed.) § 858: Wharton on Criminal Law, (4th ed.) § 975.

In *Pond* v. *The People*, 8 Mich., 150, it is said in the marginal note : " A man assaulted in his dwelling is not obliged to retreat, but may use such means as are absolutely necessary to repel the assailant from his house, or prevent his forcible entry, even to the taking of life. And if the assault or breaking is felonious, the homicide becomes at common law justifiable, and not merely excusable.

" The law does not require the necessity for taking human life to be one arising out of actual and imminent danger, in order to excuse the slayer; but he may act upon a belief, arising from appearances which give him reasonable cause for it, that the danger is actual and imminent, although he may turn out to be mistaken. The guilt of the accused must depend upon the circumstances as they appear to him, and he will not be held responsible for a knowledge of the facts, unless his ignorance arises either from fault or negligence."

In 2 Bishop on Criminal Law, (7th ed.) § 707, it is said : " The defence of the dwelling house stands on a different ground, and though the question has at some periods of our

·law been in part under a cloud, it may now be deemed to be ·reasonably clear that, to prevent an unlawful entrance into a dwelling house, the occupant may make defense to the taking of human life, without being liable even for manslaughter. Of course a defense may be of a sort which will constitute manslaughter or even murder."

In *State* v. *Patterson*, 45 Verm., 308, it is said in the marginal note: " The idea embraced in the expression that *a man's house is his castle*, is not that it is his property, and that as such he has the right to defend and protect it by other and more extreme means than he might lawfully use to defend and protect his shop, his office or his barn. The ·sense in which the house has a peculiar immunity is, that it is sacred for the protection of his person and of his family. An assault on the house can be regarded as an assault upon the person only in case the purpose of such assault be injury to the person of the occupant or members of his family, and in order to accomplish this the assailant attacks the· castle in order to reach the inmate. In this view it is said, and settled, that in such case the inmate need not flee from his house in order to escape injury by the assailant, but he may meet him at the threshold and prevent him from breaking in by any means rendered necessary by the exigency, and upon the same ground and reason that one may defend himself from peril of life or great bodily harm by means fatal to the assailant, if rendered necessary by the exigency of the assault."

I think there is error in the charge.

In this opinion BEARDSLEY, J., concurred.