## The State of Connecticut *vs.* Lillian M. Perkins.

Second Judicial District, Norwich, April Term, 1914.
Prentice, C. J., Thayer, Roraback, Wheeler and Beach, Js.

The credibility of witnesses and the settlement of questions of fact upon conflicting testimony are matters within the province of the jury.

A forcible and unlawful attack upon a house in order to reach and injure the person of its owner or the members of his family may be regarded as an assault upon the person, within the meaning of the law with reference to self-defense; and in such case the owner need not flee from his home to escape injury at the hands of the assailant, but may meet him at the threshold and prevent his entry by any means which are absolutely necessary to that end, even to the taking of the assailant's life. If, however, the resistance is unnecessarily great in degree or premature in point of time—and therefore unreasonable and unlawful—the resulting homicide is manslaughter.

In this jurisdiction the right to take life in defense of one's dwelling is not limited—as it is in some States—to occasions where it is reasonably apparent that the intruder is actuated by a felonious purpose.

In the present case, which resulted in the acquittal of the accused who was charged with manslaughter, the State contended that the charge of the court virtually told the jury that no matter what the object of the intruder might be, when the doors of the house were closed against him he might be killed to prevent his entry. *Held* that the instructions given were not fairly susceptible to such an interpretation.

It was claimed that the decedent was breaking into the house merely to see his infant child, who was living there with its mother and grandmother, and that he had no ulterior object or purpose to injure any of the inmates. The trial court instructed the jury that even if the decedent had the right to see the child, and an equal right with its mother to the child's custody, he could not enforce these rights by a violent intrusion into the house of another, but must obtain his redress in a peaceable way through the aid of the courts. *Held* that no error was committed in these instructions.

Argued April 29th—decided July 13th, 1914.

Information for manslaughter, brought to the Superior Court in New London County and tried to the jury before *Greene, J.;* verdict and judgment of not

guilty, and appeal by the State for alleged errors in the charge of the court. *No error.*

*Hadlai A. Hull,* State's Attorney, for the appellant (the State).

*Jeremiah J. Desmond* and *Charles V. James,* for the appellee (the accused).

RORABACK, J.    The record discloses three reasons of appeal, two of which relate to the charge of the court upon the question of self-defense when a person is attacked in his own household. The third one complains of the action of the court in instructing the jury as to the rights of the father and mother as joint guardians of their minor children.

The accused is charged with the crime of manslaughter, in causing the death of Thomas V. Coatchaly, at Ledyard in New London county, by shooting him with a shotgun. Coatchaly was a Greek and came to this country about 1907. He married a daughter of the accused in April, 1912. He lived with his wife and mother-in-law upon the Perkins homestead until October, 1912. At this time he quarreled with his wife and left her. In the month of December he went to Texas, and his wife continued to live with her mother. Upon February 12th, 1913, Mrs. Coatchaly gave birth to a child, the offspring of the marriage with the deceased. In April, 1913, Coatchaly came to New London and proposed, through his attorney, that his wife come to New London and live with him. She did not accept this proposition. During the month of April he made two or three unsuccessful attempts to see his child.

The defendant offered evidence to prove, and claimed to have proven, the following: After the baby was born Coatchaly never asked his wife to live with him, but

posted her. In a letter to his wife he threatened to take the child away from her, and at one time told his wife that he would kill her and her mother if they did not do as he wanted. At another time she told him that she had told her mother he was coming, and that her mother did not wish him to go to the house. Coatchaly said: "I don't care for the law. If I don't see my baby I'll kill every one of you." Coatchaly was then mad, excited and nervous. On the afternoon of June 3d, 1913, Coatchaly came to the house of the accused and demanded admission, which was refused, and he imme- . diately proceeded to break down the doors of the house, all the while threatening to kill the accused. After he had broken down the storm-porch door, the accused warned him that she had two revolvers, and that if he broke through the double house-doors and attempted to come in she would shoot him. Notwithstanding this warning Coatchaly continued his violent assault upon the double doors, and, as the right-hand door was giving way, he said to the accused, with an oath: "Now I've got you, and I'll cut your guts out." The accused, at the time of his breaking into her house, believed that the deceased intended to carry out his threats to kill her, and believed that her life was in imminent danger from Coatchaly, who was a strong, robust man, twenty-eight or twenty-nine years of age, weighing about one hundred and eighty pounds. After the accused had warned the deceased that she would shoot if he broke in, and after he had broken down the right half of the house-doors, and was attempting to enter, the accused attempted to fire a revolver at him, but it would not work. She then thought of the shot-gun, which was kept near by, and fired at Coatchaly. The accused shot the deceased, as he was breaking into the house, to prevent his entering and taking her life. While living with the accused he had beaten her and

threatened to take her life. At the time when the deceased attempted to break into the house, the accused was alone in the house, except that she had in her charge two infants, one her son's child, eleven months old, the other her daughter's child, between three and four months old.

Many of the claims of the defendant as to the facts surrounding the shooting were controverted by the State. The State claimed that it might fairly be inferred from the evidence that when Coatchaly was breaking in the doors and attempting to make a violent entry into the house, the accused had no reason to believe that he intended to do or would do her or either of the children any harm or violence, or that he intended to do or would do anything but to gain access to his child.

The State claimed to have proven that Coatchaly's only motive in breaking and entering was to obtain access to his child. It was conceded by the State that Coatchaly was a trespasser in so breaking and entering. Yet it is claimed that no necessity existed for killing him for the simple purpose of preventing him from breaking into the house to see his child. It was said, in substance, that, admitting all the conditions existed substantially as the defendant contended, she was guilty of manslaughter unless it appeared that she had reasonable grounds to believe that Coatchaly intended to kill or seriously injure her, or that she was in imminent danger of death or of great bodily harm.

Although the evidence was conflicting, the jury had the right to believe the version of the defendant and her witnesses as to the important facts surrounding this unfortunate affair.

The evidence and claims of the parties were such as to require a charge upon the theory that Mrs. Perkins' motive in shooting the deceased was to save her own

life or to protect herself from bodily harm. An assault on one's house can be regarded as an assault on the person, within the meaning of the law with reference to self-defense, where the purpose of the assault is an injury to the person of the occupant or members of his family, to accomplish which the assailant attacks the house in order to reach the inmate. In this connection it is said, and settled, that in such case the inmate need not flee from his house in order to escape injury by the assailant, but he may meet him at the threshold, and prevent him from breaking in, by any means rendered necessary by the exigency; and, upon the same ground and reason, that one may defend himself from peril of life, or great bodily harm, by means fatal to the assailant, if rendered necessary by the exigency of the assault. *State* v. *Patterson*, 45 Vt. 308. This proposition was cited with approval by this court in the case of *State* v. *Scheele*, 57 Conn. 307, 328, 18 Atl. 256.

Upon this branch of the case the trial court, among other things, said to the jury: "A man may thus do what seems reasonably necessary under the circumstances in which an assault is made upon him to preserve himself from personal danger, with this limitation—that he must not take the life of a fellow-being who is assaulting him, when such fellow-being is doing no more than committing an ordinary assault and battery upon him, but only in case of extreme necessity as the only practicable method of saving his own life or protecting himself from great bodily harm; and even then he must not have brought upon himself the necessity which he set up in his defense by beginning or continuing the fight. A man who is attacked by another under circumstances which denote an intention to take his life or to do him great bodily harm, may lawfully kill the assailant, provided he uses such means as he reasonably can to avoid the necessity. It is only

when the circumstances are such as to authorize a reasonable belief that the assault is made by the first aggressor with a design to take life or inflict extreme bodily harm, that a man would be justified in attempting to kill the assailant or using violence upon him likely to kill him. What it is reasonably necessary to do in making a defense against the first aggressor depends upon all the circumstances of the particular case, the nature of the attack, and the degree of danger in which an accused person was at the time, or reasonably believed he was in. If the circumstances at the time reasonably appear to him to indicate great danger, and he acts upon such belief, he will not be deprived of the benefit of the law of self-defense because in fact the danger was less than he reasonably believed it to be. It will, of course, be a question for the jury whether the circumstances were such as could reasonably give him the belief of the existence of such great danger."

These instructions were well adapted to this issue. The jury were warranted from the evidence before them in finding the accused not guilty upon this theory and claim. But the State contends that the court erred in saying to the jury: "A man is not obliged to retreat if assaulted in his dwelling, but may use such means as are absolutely necessary to prevent the assailant's forcible entry, even to the taking of life. If a man is making an unlawful entry by force into the house of another, the owner may, for the sole purpose of preventing the execution of such unlawful act, make resistance sufficient in degree and in time to prevent it. He is under no obligation to admit the unlawful intruder, or to flee from the house and permit him to effect an unlawful entrance. If the resistance is neither greater in degree nor earlier in time than is necessary, and it results in the death of the assailant, it is justifiable homicide; and the slayer is to be judged as the circumstances really ap-

peared to him at the moment. If the resistance is unnecessarily great in degree, or early in time, and therefore unreasonable, and therefore unlawful, and results in the death of the assailant, it is manslaughter. But even if the circumstances are such as would justify the householder in taking the life of the assailant who is violently and unlawfully breaking into the house for the purpose of preventing such breaking in, still, if the houseowner take the opportunity of the breaking in to kill the intruder, not for the sake of preventing the unlawful intrusion, but to gratify his hatred, malice or illwill against the intruder, then the killing will be at least manslaughter, if not murder. You should apply these principles to the facts in this case as you find them from the evidence. First, was the accused, as the defense claims, making a reasonable and necessary defense against the deceased in an attempt, either real or apparently real, to take the life or do serious bodily harm to herself or the children who were under her charge and part of her family? Second, was the deceased, as the defense claims, violently and unlawfully breaking into the house of the accused against her will; and was her resistance, as the defense also claims, no greater or earlier than necessary to prevent such breaking in? Third, if the defense made by the accused was no greater or earlier than necessary to prevent such breaking in, was it made in good faith, for the sole purpose of preventing such breaking in; or did the accused merely take advantage of the opportunity offered by the breaking in to gratify illwill against the deceased by killing him?"

The State claims that by these instructions the jury were told that "no matter what the object of an intruder might be, when the doors are shut the householder may kill the intruder to prevent his entry into the house. As it was admitted that the deceased was

breaking into the house, under the charge the jury had no alternative."

This is not a fair interpretation of these remarks. In effect the jury was instructed that if one is attacked unlawfully in his own dwelling-house by one who is attempting to make a forcible and unlawful entry therein, he is not obliged to retreat, but he may use such means as are absolutely necessary to prevent the assailant's forcible entry, even to taking life. It is justifiable homicide if it appears that the resistance is neither greater in degree nor earlier in time than is necessary, unless the householder, under such circumstances, should take the opportunity of the unlawful entry to kill the intruder to gratify his hatred, malice or illwill, when the killing will be at least manslaughter.

While these instructions are not in accord with the law of those jurisdictions where the right to take life in the defense of one's dwelling is limited to occasions where it is reasonably apparent that the intruder is actuated by a felonious purpose, they well state what we regard as the better and sounder rule. 1 Wharton on Criminal Law (11th Ed.) § 634; 1 Bishop, Criminal Procedure (2d Ed.) § 195.

The court did not err in instructing the jury as follows: "Assuming that the deceased had a right to see the child, and had an equal right to its custody with the mother, he had no right to enforce his prerogatives with regard to the child by a violent intrusion into the house of another person. The law was open to him, and it would be very easy for him to have tested the right of possession, either by an attempt to remove his coguardian, if she were an improper person, or to let the court decide who, in regard to the best interests of the child, was the best person to have the custody of it."

The right of self-defense and the right of redress are

two different things. You may prevent an injury from being done by all proper means, but, when done, you cannot take redress into your own hands. The right of redress is provided for in no uncertain terms. Our Constitution provides that "all courts shall be open, and every person, for an injury done to him in his person, property or reputation, shall have remedy by due course of law, and right and justice administered without sale, denial or delay." Constitution of Connecticut, Article First, § 12. This declaration asserts the broad doctrine that for every injury to person or property, the redress is to be administered by the "courts" and in "due course of law."

There is no error.

In this opinion the other judges concurred.