******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* DAVID B. TERWILLIGER
(SC 19013)

Rogers, C. J., and Palmer, Zarella, Eveleigh, McDonald, Espinosa and Robinson, Js.

*Argued February 20—officially released December 2, 2014*

*Jeffrey C. Kestenband*, with whom was *Marc D. McKay*, for the appellant (defendant).

*James M. Ralls*, assistant state's attorney, with whom, on the brief, were *Patricia M. Froelich*, state's attorney, and *Mark Stabile* and *Matthew Crockett*, senior assistant state's attorneys, for the appellee (state).

*Opinion*

EVELEIGH, J. The defendant, David B. Terwilliger, appeals from the judgment of conviction, rendered after a jury trial, of one count of intentional manslaughter in the first degree with a firearm pursuant to General Statutes §§ 53a-55a and 53a-55.[1] The defendant contends on appeal that (1) his conviction violated his constitutionally protected right against double jeopardy because a reasonable possibility existed that the defendant was acquitted of the offense at an earlier trial, and (2) in instructing the jury on the defendant's chosen defense of defense of premises, the trial court improperly construed the term "crime of violence" too narrowly, and refused to instruct the jury on the elements of the various offenses that fall within the definition of "crime of violence." We disagree with the defendant and, accordingly, we affirm the judgment of the trial court.

In 2005, the defendant was tried for the murder of Donald Kennedy (Donald). The jury acquitted the defendant of murder, but convicted him of the lesser included offense of manslaughter in the first degree with a firearm. See *State* v. *Terwilliger*, 294 Conn. 399, 403–406, 984 A.2d 721 (2009). The jury empaneled in the 2005 trial did not specify whether it found the defendant guilty of intentional manslaughter in the first degree with a firearm or reckless manslaughter in the first degree with a firearm. "The defendant appealed to the Appellate Court, which reversed the judgment of conviction and ordered a new trial after concluding that it was reasonably possible that the trial court's jury instruction on defense of premises misled the jury." Id., 406. The state petitioned for certification, and this court affirmed the judgment of the Appellate Court. Id., 400–401. The defendant was retried in 2011. The state charged the defendant with two counts of manslaughter in the first degree with a firearm. Specifically, the state charged the defendant with one count of intentional manslaughter in the first degree with a firearm pursuant to §§ 53a-55a and 53a-55 (a) (1), and with one count of reckless manslaughter in the first degree with a firearm pursuant to §§ 53a-55a and 53a-55 (a) (3). The jury convicted the defendant of intentional manslaughter in the first degree with a firearm. This appeal followed.[2]

The jury reasonably could have found the following facts. The defendant is married to Beverly Daniels. Daniels is the mother of Christine Kennedy (Christine). Christine married Donald, and together they had three children, Shauna Kennedy (Shauna), Kathryn Kennedy (Kathryn), and James Kennedy (James). In 2003, Donald and Christine were not living together. Kathryn and her four year old daughter were living with the defendant and Daniels. Donald had also previously lived in the basement of the defendant's home with the defendant's permission, but since that time he had moved out and

rented an apartment in Webster, Massachusetts.

At some point during the day on January 5, 2003, James had an altercation with another young man from the neighborhood, Steven Gardner, which resulted in Gardner striking James. That evening, the defendant was inside of his home with Daniels, Kathryn, and Kathryn's daughter, when Donald unexpectedly drove to the defendant's house and parked in the defendant's driveway. Another neighborhood young man, Ben Monahan, had just parked his car on the street with the intention of visiting Kathryn and James. When he walked up to the defendant's driveway, Donald stated to Monahan "I'm drunk and I'm pissed," and that he wanted to "beat the shit out of [the defendant]" because of a recent incident between the defendant and James. At one point, Donald asked Monahan if he wanted to go fight some people who were standing near a car across the street. Monahan demurred, and Donald then saw Gardner, who was also hoping to visit Kathryn that evening, walking toward the defendant's residence. According to Monahan, Donald "yell[ed] '[y]ou hit my son' [and] something along the lines of 'I'm going to kick your ass' or '[n]o one hits my son.' " Donald then grabbed Gardner, shoved him against a car at least once and possibly struck Gardner at least once in the face. Kathryn and Daniels both witnessed the confrontation from inside the house. Kathryn yelled at Donald, asking him to stop his behavior, while Daniels urged the defendant to go outside and defuse the situation. The defendant replied that he would "handle [the situation] however the hell [he] want[ed]." Before leaving the house, the defendant took from his desk a revolver that he had previously loaded with hollow point bullets and placed it into the pocket of his coat, where it was concealed. The defendant went outside and confronted Donald. Donald may have made a comment "like, '[c]ome on, let's get this started.' " According to Kathryn, the two men stared at each other. Then, the defendant walked up to Donald and kicked him in the groin, drew the revolver from his coat pocket, and fired it once. The bullet struck Donald in the lower chest and did not exit, causing him to fall to the ground. Daniels immediately called 911 and requested that emergency personnel arrive at the scene, while Kathryn took her daughter and ran to a neighbor's house. The defendant walked over to the house of another neighbor, Frank Langlois, and, after initially being resistant, handed the jacket containing the revolver over to Langlois. Langlois then went to check on Donald. Langlois observed that Donald was in possession of a closed folding knife that was attached to a chain connecting Donald's wallet to his pants, and Langlois detected a strong odor of alcohol. A subsequent autopsy revealed Donald's blood alcohol level was 0.15.

Prior to the defendant's second trial in 2011, the defendant moved to dismiss the prosecution, claiming

that the continued prosecution of him for the events that occurred on January 5, 2003, constituted a violation of his right against double jeopardy. The trial court denied the motion, relying on *State* v. *Boyd*, 221 Conn. 685, 691, 607 A.2d 376, cert. denied, 506 U.S. 923, 113 S. Ct. 344, 121 L. Ed. 2d 259 (1992), and concluded that, by failing to take steps to clarify the jury's verdict following the first trial while simultaneously seeking reversal of his conviction, the defendant had waived his right against double jeopardy. The defendant moved for reconsideration of the denial of his motion to dismiss, and the trial court, again relying on this court's decision in *Boyd*, denied the motion. The defendant subsequently renewed his motion following the trial.

In addition, at trial, the defendant specifically requested a jury instruction on defense of premises pursuant to General Statutes § 53a-20.[3] As part of this instruction, the defendant requested that the trial court instruct the jury that the statutory term "crime of violence" included within its definition the following crimes: murder, manslaughter in the first degree, manslaughter in the first degree with a firearm, manslaughter in the second degree, assault in the first degree, assault in the second degree, assault of a victim sixty years or older in the first degree, assault of a victim sixty years or older in the second degree, unlawful restraint in the first degree, burglary in the first degree, and burglary in the second degree. The defendant also requested that the jury be instructed regarding the elements of each of these crimes. The trial court refused to give the defendant's requested charge, instead instructing the jury that the term "crime of violence" encapsulated the following offenses: "murder, manslaughter, rape, robbery, arson, burglary, assault with the specific intent to cause great bodily harm or assault in which a risk of great bodily harm was created." The trial court did not instruct the jury on the elements of these crimes. This appeal followed.[4]

I

The defendant first claims that, because the state cannot demonstrate that there is not a reasonable possibility that the defendant was acquitted of intentional manslaughter in the first degree with a firearm by the jury following his trial in 2005, his 2011 conviction for intentional manslaughter in the first degree with a firearm pursuant to § 53a-55a should be vacated because it violates his right against double jeopardy secured by the fifth amendment to the United States constitution. In response, the state makes the following claims: (1) the defendant's double jeopardy claim is unpreserved because he failed to raise the issue at his first trial; (2) pursuant to this court's approach to its review of unpreserved claimed constitutional violations; see *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989); the defendant's double jeopardy claim is unreviewable

because the defendant cannot show that a constitutional violation "clearly exists"; and (3) should this court reach the merits of the defendant's claim, the defendant cannot establish that he was acquitted of either intentional or reckless manslaughter in the first degree with a firearm. We conclude that accepting the defendant's position would necessitate us to speculate as to the jury's determination in the first trial. We decline to engage in a double jeopardy analysis on the basis of speculation. Further, even if we were to engage in such an analysis, under the particular circumstances of this case, we hold that the defendant was not prejudiced. Therefore, we affirm the conviction.

The following additional facts and procedural history are relevant to this issue. During the first trial, the theory of the state's case against the defendant was that he had acted with the intent to kill Donald. The prosecution relied on the following evidence in an attempt to show intent: (1) statements that the defendant made to Donald shortly before he shot him, which indicated that the defendant would shoot Donald if he did not leave; (2) evidence indicating that the defendant initially hid the gun from Donald by placing the gun in his coat pocket, which the state claimed was for the purpose of not alerting Donald to the gun's presence until the defendant decided to use it; (3) expert testimony that established that the defendant fired the gun at a distance of less than three inches from Donald's chest; (4) testimony that the defendant knew the gun was loaded with hollow point bullets; (5) testimony suggesting that the defendant was the initial aggressor by kicking Donald; (6) evidence indicating that the defendant did not call the police or take any other ameliorative action after shooting Donald; and (7) a statement made by the defendant to police indicating that, in the days leading up to the shooting, he experienced a recurring dream in which he shot a masked person who had been robbing the defendant's home.

Correspondingly, the defendant's primary theory of defense during the first trial was that he had been justified in using deadly force against Donald. To counter the prosecution's theory of the case, the defendant relied primarily on evidence and testimony indicating that: (1) Donald had a reputation for being a violent person; (2) Donald was intoxicated; (3) Donald was carrying a closed folding knife on his person, of which the defendant was aware; and (4) during the confrontation, Donald had knocked a telephone from the defendant's hand and made several threatening statements, the most serious of which was a threat to assault or possibly kill Daniels. The defendant, however, also advanced a second theory during the first trial, namely, that the defendant had not acted with any kind of intent. This theory was supported primarily by a statement made by the defendant during his testimony, in which he stated that Donald had "jump[ed]" at him during the confrontation,

as a result of which the defendant's gun went off.

We now turn to the applicable standard of review and governing legal principles. "The defendant's double jeopardy claim presents a question of law, over which our review is plenary. . . . The fifth amendment to the United States constitution provides in relevant part: No person shall . . . be subject for the same offense to be twice put in jeopardy of life or limb . . . . The double jeopardy clause of the fifth amendment is made applicable to the states through the due process clause of the fourteenth amendment." (Citation omitted; internal quotation marks omitted.) *State* v. *Burnell*, 290 Conn. 634, 642, 966 A.2d 168 (2009). "We have recognized that the [d]ouble [j]eopardy [c]lause consists of several protections: It protects against a second prosecution for the same offense after acquittal. It protects against a second prosecution for the same offense after conviction. And it protects against multiple punishments for the same offense." (Internal quotation marks omitted.) Id.

We now examine the merits of the defendant's claim.[5] The defendant claims that the present case involves the joinder of a jeopardy barred offense with a permissible charge. As a result, the defendant asserts, the state must prove beyond a reasonable doubt that there was no reasonable possibility that the defendant was prejudiced by the joinder. In other words, the defendant claims that the state must prove that it is not reasonably possible that the jury in the 2005 trial acquitted the defendant of intentional manslaughter in the first degree with a firearm as defined in § 53a-55 (a) (1).

The defendant claims that the situation at issue in the present case is similar to the one this court faced in *State* v. *Hedge*, 297 Conn. 621, 1 A.3d 1051 (2010). In *Hedge*, the defendant was charged with, inter alia, possession of cocaine with intent to sell by a person who is not drug-dependent in violation of General Statutes § 21a-278 (b), possession of opium with intent to sell by a person who is not drug-dependent in violation of § 21a-278 (b), and possession of narcotics with intent to sell within 1500 feet of a public housing project in violation of General Statutes § 21a–278a (b). See id., 662. The case proceeded to trial, and at the close of evidence, "the trial court dismissed the charge of possession of opium with intent to sell by a person who is not drug-dependent on the ground that the state had failed to prove that one of the narcotic substances that was seized from the defendant's vehicle was, in fact, opium. Thereafter, the jury returned a verdict of guilty on the failure to appear charge but was unable to reach a verdict on the remaining two drug charges. The trial court thereafter declared a mistrial as to those charges." (Footnote omitted.) Id. The state decided to retry the defendant, ultimately charging him with, inter alia: "transporting 'a narcotic substance, to wit: cocaine and

heroin' with intent to sell by a person who is not drug-dependent . . . ." Id., 664. "After the state filed the second amended information, the defendant moved to dismiss the charges as they related to heroin on double jeopardy grounds."[6] Id. Because it concluded that heroin and opium are different drugs, the trial court denied the motion to dismiss, and ultimately instructed the jury regarding the aforementioned charge that it could convict the defendant if it concluded that the defendant had "transported 'either' cocaine or heroin with [the intent to sell]." Id., 664–65. The jury found the defendant guilty on this charge, but returned a general verdict. Id., 665, 667–68. As a result, this court observed that "there is no way of knowing whether it found the defendant guilty on the basis of his transportation of cocaine, heroin or both." Id., 668. On appeal, all parties agreed that, "the second trial violated principles of double jeopardy insofar as the jury was permitted to consider the defendant's alleged transportation of heroin with intent to sell." Id., 665.

This court also stated in *Hedge* that "[a]s a general matter, when the state charges a defendant in separate counts with a jeopardy barred offense and an offense that is not so barred, and the jury finds the defendant guilty on both counts, the defendant is entitled to a new trial on the nonbarred offense unless the state is able to prove beyond a reasonable doubt that the joinder of the two charges did not prejudice the defendant." Id., 666–67. Because this court could not be certain that the jury had not found the defendant guilty on the charge of unlawfully transporting a narcotic substance with intent to sell by a person who is not drug-dependent in violation of § 21a-278 (b) on the basis of a conclusion that the defendant had transported heroin with the requisite intent—a conclusion that would have been in violation of the defendant's right against double jeopardy—this court determined that it was necessary to reverse the defendant's conviction with regard to that charge. Id., 668. Moreover, because, pursuant to the trial court's instructions, the jury could have conceivably found the defendant guilty on this charge by determining that he was *only* transporting heroin with intent to sell, this court also determined that the defendant could not subsequently be retried for the unlawful transportation of cocaine with intent to sell "unless the state can demonstrate beyond a reasonable doubt that he was not acquitted of that charge at his first trial." Id.

This court ultimately concluded in *Hedge* that, in a subsequent retrial, the state would be able to show beyond a reasonable doubt that the defendant had not been acquitted of unlawfully transporting cocaine with intent to sell, given that (1) in a separate count, the same jury found the defendant guilty of possession of cocaine, and (2) the drugs recovered by the police consisted of 189 packages of cocaine and 15 "folds" of heroin, and 100 of the packages of cocaine were found

in the same bag as the folds of heroin. Id., 669. As a result, this court concluded that "it is virtually inconceivable that the jury found the defendant guilty of transporting narcotics with intent to sell on the basis of the defendant's possession of heroin but also found that he had not transported with intent to sell the much larger quantity of cocaine, which was found in the very same container as the heroin." Id.

The defendant claims that, akin to the situation in *Hedge*, the state cannot show beyond a reasonable doubt in the present case that he was not acquitted of intentional manslaughter in the first degree with a firearm at his first trial. During the first trial in 2005, the trial court instructed the jury that it could find the defendant guilty of manslaughter in the first degree with a firearm if it concluded that the defendant acted intentionally *or* if it concluded that the defendant acted recklessly while engaging in conduct that created a grave risk of death to another person and actually caused the death of that person. See General Statutes §§ 53a-55 (a) (1) and (3), and 53a-55a (a). The trial court also instructed the jury that, if it concluded that the defendant had committed a lesser included offense, it "must be unanimous as to the facts of how the crime was committed to return a guilty verdict." The defendant contends that this court has previously held that a person cannot act intentionally at the same time that he or she acts recklessly; see, e.g., *Griffin* v. *Parker*, 219 Conn. 363, 370, 593 A.2d 124 (1991); and, thus, the jury necessarily acquitted the defendant of either reckless or intentional manslaughter in the first degree. Relying on *Hedge*, the defendant claims that the state bears the burden of proving that the first jury did *not* acquit the defendant of intentional manslaughter in the first degree, and, because the state failed to clarify that jury's verdict, it cannot now meet that burden. The defendant thus contends that the state cannot show that there is not a reasonable possibility that his second prosecution prejudiced his right against double jeopardy.

The state claims that *Hedge* is distinguishable because, unlike the situation in *Hedge*, there has been no clear acquittal in the present case. Specifically, the state claims that the defendant here failed to clarify the initial verdict of the jury and, thus, failed to preserve his claim that the second prosecution violated his right against double jeopardy. To the extent that this court may review unpreserved constitutional claims pursuant to *Golding*, the state claims that the record is inadequate for review because the defendant has not shown that a constitutional violation "clearly exists." In addition, the state contends that the defendant cannot demonstrate that an acquittal necessarily occurred in the present case because, the state claims, this court has previously held in *State* v. *Rodriguez*, 180 Conn. 382, 403–405, 429 A.2d 919 (1980), that a mental state involving

a specific intent to commit a crime and the mental state of recklessness are not inconsistent with one another for purposes of charging lesser included offenses.

The defendant contends that, in finding the defendant guilty of manslaughter, the jury at the defendant's first trial must have necessarily determined that he committed the crime with either the requisite intent or recklessly. See General Statutes § 53a-55 (a) (1) and (3). Building on this logic, the defendant claims that in deciding that he acted with one mental state, the jury implicitly determined that he did not possess the other. The defendant asserts that it would have been reasonable for the jury to convict the defendant of *either* intentional or reckless manslaughter at the first trial, and, thus, it was equally reasonable for the jury to have acquitted the defendant under either subdivision of § 53a-55 (a). Thus, because the first jury's general verdict was never clarified, the defendant contends that the state has the burden of proving beyond a reasonable doubt that no reasonable possibility exists that the defendant was prejudiced by his subsequent prosecution for *both* intentional and reckless manslaughter in the first degree with a firearm. To put it differently, because the state cannot prove that the defendant was not implicitly acquitted of intentional manslaughter in the first degree during the first trial, it cannot now prove beyond a reasonable doubt that there is no reasonable possibility that the defendant's conviction for intentional manslaughter at his second trial was not barred by the double jeopardy clause.

In *State* v. *King*, 216 Conn. 585, 592–95, 583 A.2d 896 (1990), this court held that a person cannot act both intentionally and recklessly at the same time. See id., 593–94 (Relying on, inter alia, this court's decision in *State* v. *Beccia*, 199 Conn. 1, 4, 505 A.2d 683 [1986], this court concluded that "[t]he intent to cause death required for a conviction of attempted murder . . . necessitated a finding that the defendant acted with the conscious objective to cause death. The reckless conduct necessary to be found for a conviction of assault under the subsection charged . . . required a finding that the defendant acted without such a conscious objective" and that "the statutory definitions of 'intentionally' and 'recklessly' are mutually exclusive and inconsistent. 'Reckless conduct is not intentional conduct because one who acts recklessly does not have a conscious objective to cause a particular result.' . . . Therefore, the transgression that caused the victim's injuries was either intentional or reckless; it could not, at one and the same time, be both." [Citation omitted.]).

During jury instructions, the trial court gave the jury an "acquittal first" instruction,[7] an instruction on the elements of the crime of manslaughter in the first degree with a firearm,[8] and the relevant definitions of the terms "intent" and "reckless." During its instructions on the

elements of manslaughter in the first degree as it is defined in § 53a-55 (a) (1) and (3), the trial court instructed the jury that "[t]his offense may be committed in either [of] two possible ways." The trial court first explained the elements of intentional manslaughter, as described in § 53a-55 (a) (1), and then described the elements of reckless manslaughter, as described in § 53a-55 (a) (3), referring to this subdivision as "[t]he alternate way for a person to commit manslaughter in the first degree . . . ." The jury returned a general verdict, finding the defendant guilty of manslaughter in the first degree with a firearm. The jury did not indicate whether it found that the defendant had committed intentional manslaughter or reckless manslaughter.

Both subdivisions (1) and (3) of § 53a-55 (a) require that the defendant cause the death of a person; where the two subdivisions differ is with regard to the mental state of the defendant at the time of the act in question. Moreover, both the state and the defendant conceded that the defendant was the person who shot Donald. Thus, it is argued by the defendant, the jury, in delivering its verdict, necessarily determined that the defendant acted either with the intent to cause serious injury to Donald, or it concluded that the defendant had acted in conscious disregard of the risk that his actions would cause Donald's death.[9] Assuming, without deciding, that we agree with the defendant's position, the lack of clarification on this issue would cause us to speculate as to the jury's ultimate determination. "This is a salutary rule that recognizes the sanctity of the jury's deliberations and the strong policy against probing into its logic or reasoning, which would open the door to interminable speculation." (Internal quotation marks omitted.) *State* v. *Stevens*, 178 Conn. 649, 654, 425 A.2d 104 (1979).[10]

As the defendant states in his brief, in asserting that the state had the burden to show that there was no reasonable possibility of an acquittal, "any attempt to divine the factual basis of the first jury's verdict would have been speculative, futile, and disingenuous . . . ." This is a critical distinction between the present case and the situation in *Hedge*. In *Hedge*, at the conclusion of his first trial, the judge clearly dismissed the charge of possession of opium because there was no proof that the defendant had possessed opium, thus preventing the state from relitigating this point in a subsequent trial. See *State* v. *Hedge*, supra, 297 Conn. 662–66. In the present case, the jury's verdict, as acknowledged by both parties, was ambiguous as to its decision regarding the defendant's mental state. The evidence presented at the first trial, and the arguments made by the parties therefrom, as described previously in this opinion, was entirely consistent with a jury verdict convicting the defendant of either intentional or reckless manslaughter in the first degree. Thus, the jury verdict did not necessarily depend on a finding that the defendant

lacked the intent to inflict a serious physical injury on Donald. Therefore, we would have to resort to speculation in order to divine the jury's intention. We decline the defendant's invitation to do so.

We are not the first court to choose to avoid undue speculation when faced with a general jury verdict that convicts the defendant of a single offense but is ambiguous as to the specific theory on which the jury relied in rendering its verdict. Numerous courts, when wrestling with the issues presented by similar verdicts, have found that this sort of general verdict does not have the same preclusive effect as would a general verdict of acquittal. See, e.g., *United States* v. *Garcia*, 938 F.2d 12, 13–16 (1991), cert. denied, 502 U.S. 1030, 112 S. Ct. 868, 116 L. Ed. 2d 774 (1992); *State* v. *Wright*, 165 Wn. 2d 783, 790–91, 796–803, 203 P.3d 1027 (2009). For example, in *Garcia*, the defendants were charged with, inter alia, extortion, and at their first trial the prosecutor argued that the defendants could be convicted of this crime pursuant to either one of two alternative legal theories, "extortion by wrongful use of fear and . . . extortion under color of official right." *United States* v. *Garcia*, supra, 13. The jury convicted the defendants of extortion, but did not indicate which of the two theories advanced by the prosecution it had accepted. Id. On an earlier appeal, the Second Circuit Court of Appeals had determined that, because the jury's reasoning in arriving at the conviction was ambiguous, the court could not conclude that the jury had ascribed to the first theory advanced—extortion by wrongful use of fear—which, the court concluded, should not have been presented to the jury in the first place. Id. As a result, the court vacated the defendants' convictions. Id. The defendants were then retried, with the prosecution advancing only the second, permissible legal theory. Id. The defendants filed a motion to dismiss with the trial court retrial, claiming that this second prosecution was barred by the double jeopardy clause. Id. When the issue made its way to the court on appeal, the Second Circuit rejected the defendants' argument. It contrasted the situation in *Garcia* with the seminal case *United States* v. *Green*, 355 U.S. 184, 78 S. Ct. 221, 2 L. Ed. 2d 199 (1957), in which the United States Supreme Court held that a jury's silence on one charge may sometimes operate as an implicit acquittal.[11] The Second Circuit noted that "[i]n the present case . . . the [defendants] were convicted on the contested charge, and the only unanswered question was under which of two extortion theories the jury had based its conviction. And since the jury was never asked to state the basis for its conviction on the extortion charge, its silence on the question, unlike the silence of the jury in *Green*, signifies nothing. The conclusion that the [defendants] ask us to accept regarding the extortion theory involves unacceptable speculation—which was precisely the reason that we reversed the [defendants'] convictions in the first

place." *United States* v. *Garcia*, supra, 15. In some respects, the present case is even stronger than the one faced by the Second Circuit in *Garcia*, because the defendant here has not raised a sufficiency of the evidence claim with regard to either relevant theory of first degree manslaughter.

Similarly, *Wright* involved a case in which two defendants had each been convicted of second degree murder, but it was unclear pursuant to which theory each defendant had been convicted—intentional murder or felony murder. See *State* v. *Wright*, supra, 165 Wn. 2d 788–91. The Washington Supreme Court then decided two cases, *In re Personal Restraint of Andress*, 147 Wn. 2d 602, 605, 56 P.3d 981 (2002), and *In re Personal Restraint of Hinton*, 152 Wn. 2d 853, 857, 100 P.3d 801 (2004), which invalidated one of the potential alternative theories on which the defendants' convictions had rested. The defendants in *Wright* both challenged the ability of the state to retry them on the remaining potential alternative on which their second degree murder convictions had rested, claiming that to permit the state to do so would violate the double jeopardy clause of the fifth amendment to the United States constitution. *State* v. *Wright*, supra, 791–93. The Washington Supreme Court rejected the defendants' claim, relying in large part on a footnote by the United States Supreme Court in *Green*: "[In] *Green* [the United States Supreme Court] stated, '[i]t is immaterial whether second degree murder is a lesser offense included in a charge of felony murder or not. *The vital thing is that it is a distinct and different offense.'* [*United States* v. *Green*, supra, 355 U.S. 194 n.14] . . . . Unlike in *Green*, this case does not involve a separate offense; it involves alternative means of committing a single offense. . . . Neither the United States Supreme Court nor this court has ever concluded a jury's silence bars retrial on an alternative means of committing a single offense . . . ." (Citation omitted; emphasis in original.) *State* v. *Wright*, supra, 798.[12]

The statute pursuant to which the defendant was charged and convicted creates only one crime—manslaughter in the first degree—and treats the two subdivisions at issue here as alternative ways to commit that crime. See *State* v. *Marino*, 190 Conn. 639, 650–51, 462 A.2d 1021 (1983) (describing three subdivisions of § 53a-55 [a] as alternative ways to commit one crime), overruled on other grounds by *State* v. *Chapman*, 229 Conn. 529, 643 A.2d 1213 (1994). This court's analysis of a similarly worded statute in *State* v. *Tanzella*, 226 Conn. 601, 607–14, 628 A.2d 973 (1993), is also informative. In *Tanzella*, the state charged the defendant with, inter alia, assault in the third degree based on the theory that the defendant had recklessly caused serious physical injury. Id., 606. The state then sought to amend the information, charging the defendant with having violated the same statute, but this time under the theory

that he had assaulted his victim with intent to cause physical injury. Id. This court concluded that the amendment of the information was not improper pursuant to Practice Book (1993) § 624 (now § 36-18) because "the [subdivisions] of the statutes in question do not constitute different crimes . . . . [T]hey describe alternative means of committing a single crime." Id., 612.

The statute at issue in the present case, § 53a-55 (a), treats intentional manslaughter and manslaughter when committed recklessly under circumstances evincing an extreme indifference to human life[13] identically with regard to the culpability of the offense. As a result, the defendant was accused of committing only one crime at his second trial, the same crime that he had been convicted of at his first trial. Because the defendant's original conviction was set aside as a result of his first appeal; see *State* v. *Terwilliger*, supra, 294 Conn. 400–401; jeopardy on that offense continued and was not cut off. See, e.g., *State* v. *Boyd*, supra, 221 Conn. 691. At the second trial, the state merely chose to advance two alternative theories when it sought to convict the defendant of the crime of manslaughter in the first degree with a firearm. It remains true that "it is a fundamental principle of the constitutional prohibition against double jeopardy that a defendant may not be retried for an offense of which he has been acquitted"; *State* v. *Tate*, 256 Conn. 262, 284, 773 A.2d 308 (2001); and that " 'doubts about whether an offense is jeopardy-barred must be resolved "in favor of the liberty of the citizen." ' " Id., 288, quoting *Downum* v. *United States*, 372 U.S. 734, 738, 83 S. Ct. 1033, 10 L. Ed. 2d 100 (1963). At the same time, "[t]he protection of the [d]ouble [j]eopardy [c]lause 'applies only if there has been some event, such as an acquittal, which terminates the original jeopardy.' " *United States* v. *McCourty*, 562 F.3d 458, 473 (2009), cert. denied, 558 U.S. 1100, 130 S. Ct. 1012, 175 L. Ed. 2d 634 (2009), quoting *Richardson* v. *United States*, 468 U.S. 317, 325, 104 S. Ct. 3081, 82 L. Ed. 2d 242 (1984).

Further, this case does not present a situation that the double jeopardy clause was intended to prevent. In this opinion, we previously have noted the express purposes of the double jeopardy clause. First, there is no showing that there was a second prosecution in this case after an acquittal. We simply do not know, and will not speculate on, the jury's decision. Second, there was no prosecution for another offense after a conviction due to the appeal. Third, in view of the nature of the statute, there were not multiple punishments for the same offense. We are, therefore, confident that there was no double jeopardy violation established in this case.

The utter lack of prejudice to the defendant under the unique circumstances of this case buttresses our conclusion that the defendant's double jeopardy rights

have not been violated. The Second Circuit has counseled that, in a retrial, there should be "no reasonable possibility that [a] violation of [the defendant's] constitutional rights worked to his prejudice." *United States ex rel. Hetenyi* v. *Williams*, 348 F.2d 844, 866–67 (1965), cert. denied sub nom. *Mancuse* v. *Hetenyi*, 383 U.S. 913, 86 S. Ct. 896, 15 L. Ed. 2d 667 (1966). We are confident that there was no prejudice to the defendant in the present case.

In the present case, the evidence presented at both trials by the state would have been admissible regardless of the implicit acquittal by the jury of one of the charged subdivisions of § 53a-55.[14] Similarly, the behaviors described by subdivisions (1) and (3) of § 53a-55 (a) are considered equally culpable and are subject to identical potential punishments.

In this respect, the present case is similar to *United States ex rel. Jackson* v. *Follette*, 462 F.2d 1041 (2d Cir.), cert. denied sub nom. *Jackson* v. *Follette*, 409 U.S. 1045, 93 S. Ct. 544, 34 L. Ed. 2d 496 (1972). In *Follette*, the defendant was accused of murdering a police officer following an armed robbery of a hotel and charged with both felony murder and premeditated murder, both of which qualified as "murder in the first degree" under the relevant state statute. Id., 1043. During his first trial, the jury was instructed that "if it returned a verdict on one count it was to remain silent on the other." Id. The jury returned a verdict of guilty for premeditated murder, and said nothing regarding the charge of felony murder. Id. The defendant's conviction was affirmed on direct appeal, but the defendant ultimately successfully overturned his conviction based on a procedural challenge. Id.; see also *Jackson* v. *Denno*, 378 U.S. 368, 84 S. Ct. 1774, 12 L. Ed. 2d 908 (1964). The state retried the defendant on charges of both premeditated murder and felony murder. *United States ex rel. Jackson* v. *Follette*, supra, 1044. At this second trial, the jury convicted the defendant only of felony murder. Id. On appeal, the defendant claimed that his conviction for felony murder violated his right against double jeopardy because the jury at his first trial had either acquitted him of felony murder or else it had been "dismissed without his consent after having been given a 'full opportunity to return a verdict' on that charge without any circumstances appearing that prevented it from doing so." Id., 1045. The court agreed with the defendant that he had been "exposed to 'a risk of conviction' for felony murder on his first trial" but, given that both felony murder and premeditated murder both qualified as "first degree murder" it was unclear whether conviction of only one and silence as to the other qualified as an acquittal. Id., 1045–46. The court acknowledged that "the facts in this particular case justified a charge of either  . . . ." Id., 1048. The court ultimately concluded that "[w]e have, in short, a case that is sui generis, not controlled by any Supreme Court case on its

facts, and not capable of simple resolution either on an historical or logical basis. Without disregarding the teachings of history or of the cases, we come to the point where we must weigh on a fine scale the competing interests of the public and [the defendant]." (Footnotes omitted.) Id., 1049. The Second Circuit thus balanced "fairness to society in obtaining a verdict on a proper indictment and the avoidance of undue vexation to the defendant by a retrial on both original charges . . . ." Id. The court noted that there did not appear to be any evidentiary prejudice to the defendant as a result of the retrial, and that both parties had previously had opportunities to cure the ambiguity that resulted when the first jury was silent as to the charge of felony murder. Id. As a result, it concluded that "[f]airness to the public appears to us to demand that a valid indictment end in a verdict where there has been no conviction of a lesser-included offense . . . no mistrial by virtue of the court's action sua sponte without the defendant's consent . . . and where the cause for reversal of the conviction of the co-equal offense is reversible error in the admission of evidence, at least where, as here, the same evidence is admissible (or inadmissible) as proof of either offense charged . . . . Nor is there any substantial unfairness to [the petitioner]. . . . [The defendant] in any event would have been subject to retrial on the premeditated murder count, and . . . retrial on the felony murder count did not subject him to a greater penalty or stigma or greater embarrassment, expense or ordeal." Id., 1050.

Applying similar logic in the present case, it cannot be contested that the first jury concluded that the defendant had committed the crime of manslaughter in the first degree pursuant to either subdivision (1) or (3) of § 53a-55 (a). The only potential difference in the elements of those two charges is the mental state of the defendant while causing the death of the victim. Furthermore, regardless of which mental state the first jury concluded the defendant possessed, it is plain that both juries rejected the defendant's chosen defenses at each trial. Given that an actor's mental status can only be inferred from circumstantial evidence, such as his or her behavior, the same evidence would have been admissible regardless of whether the defendant was retried on only one of the subdivisions of § 53a-55 (a) or both of them. In addition, the penalty for committing manslaughter in the first degree as defined under either relevant subdivision is identical. Finally, given that retrial on one of the subdivisions of § 53a-55 (a) would have occurred in any event, retrial on both counts did not subject the defendant to any "greater penalty, or stigma, or greater embarrassment, expense or ordeal." Id. Therefore, we are inexorably led to the conclusion that the defendant has not suffered any prejudice as a result of the second trial.

We note that the defendant had an opportunity to

clarify the verdict at his first trial, and did not do so. We have not previously held that a defendant has any affirmative obligation to clarify a general or otherwise ambiguous verdict in order to preserve a subsequent double jeopardy violation, nor will we do so today.[15] We find it appropriate, however, to consider the defendant's failure to clarify the verdict at his first trial when examining the potential prejudice of the claimed double jeopardy violation during the latter trial. Had the defendant taken steps to clarify the first jury's verdict, he would have been able to eliminate all speculation as to whether his subsequent conviction was obtained in violation of his fifth amendment rights. More importantly, given the ambiguity that existed following the general verdict, we cannot conceive of a way for the state to have proceeded following the initial reversal of the defendant's conviction that would have not given rise to the defendant's double jeopardy argument. Even if the state had charged the defendant at the second trial with only intentional manslaughter in the first degree, the defendant would have been able to credibly make the argument that, since the evidence presented at his first trial also supported a conviction based on either the reckless or intentional theory, the first jury might well have convicted him based on the former theory, which, assuming without deciding that we would follow the dictates of *King*, would have acquitted him of the latter. Had the defendant taken it upon himself to clarify the record, no ambiguity would have existed, and we would not have had to speculate regarding the jury's verdict.

Finally, we note that although the defendant has a valid interest in not being subjected to successive prosecutions, this interest is counterbalanced by that of the public in preserving a valid conviction. We emphasize that this is not a situation in which the state treated the first trial against the defendant as a "dry run"; cf. *Ashe* v. *Swenson*, 397 U.S. 436, 443, 90 S. Ct. 1189, 25 L. Ed. 2d 469 (1970); but instead presented essentially the same case and made the same arguments against the defendant in both trials. The consequences for both alternatives are identical, and the state was unquestionably permitted to retry the defendant under either subdivision (1) or (3) of § 53a-55 (a) and § 53a-55a. In support of our conclusion that there is no double jeopardy violation in this case, the minimal potential prejudice to the defendant due to the state's decision to charge the defendant under the alternative subdivisions simply does not outweigh the competing interest of ensuring that a valid conviction is preserved.

For the foregoing reasons, and limited to the extremely unusual circumstances presented by the present case, we conclude that the double jeopardy clause of the fifth amendment to the United States constitution does not require the defendant's conviction of manslaughter in the first degree with a firearm pursuant to

§§ 53a-55 (a) (1) and 53a-55a to be vacated.

## II

The defendant next contends that he is entitled to a new trial because the trial court's jury instruction regarding defense of premises included a definition of the term "crime of violence" that was "too narrow and vague," and because the trial court declined to instruct the jury on the elements of those offenses that it included in the definition of "crimes of violence." Although we agree with the defendant to the extent that he suggests the definition provided by the trial court for the term "crime of violence" was incorrect, we conclude that the defendant was not entitled to an instruction on the elements of the various statutory offenses that he claims constitute "crimes of violence."

We first address the proper standard of review. "A fundamental element of due process is the right of a defendant charged with a crime to establish a defense. . . . An improper instruction on a defense, like an improper instruction on an element of an offense, is of constitutional dimension. . . . [T]he standard of review to be applied to the defendant's constitutional claim is whether it is reasonably possible that the jury was misled. . . . In determining whether the jury was misled, [i]t is well established that [a] charge to the jury is not to be critically dissected for the purpose of discovering possible inaccuracies of statement, but it is to be considered rather as to its probable effect [on] the jury in guiding [it] to a correct verdict in the case. . . . The test to be applied to any part of a charge is whether the charge, considered as a whole, presents the case to the jury so that no injustice will result. . . . In reviewing the trial court's failure to charge as requested, we must adopt the version of facts most favorable to the defendant which the evidence would reasonably support. . . . A challenge to the validity of jury instructions presents a question of law over which [we have] plenary review." (Citations omitted; internal quotation marks omitted.) *State* v. *Terwilliger*, supra, 294 Conn. 411–12.

The defendant contends that the definition of the term "crime of violence" as it is used in § 53a-20 is coextensive with the list of crimes classified as " 'violent offenses' " by the Board of Parole pursuant to General Statutes § 54-125a (b) (2). The defendant claims that this definition is also consistent with the definition of the term as it appears in 18 U.S.C. § 16. The defendant also contends that the trial court's instructions to the jury regarding defense of premises were flawed because the trial court failed to instruct the jury on the specific elements of each of the crimes that are considered "crimes of violence." The defendant claims that the trial court's failure to instruct the jury on the elements of the crime of burglary was particularly harmful, because he contends that the elements of that particular crime,

as it is defined in Connecticut, are not necessarily well-known by laypersons.

The state contends that, although it did not do so in the defendant's requested terminology, the trial court's instruction on defense of premises incorporated all of the defendant's requested included offenses except for third degree assault, and also included several offenses that the defendant had not requested. The state also asserts that, rather than looking to the term "crime of violence" as it is defined by the Board of Parole or in 18 U.S.C. § 16, this court should look to the common law to ascertain the legislature's intended meaning of "crime of violence" as it is used in § 53a-20. As a result, the state urges this court to read § 53a-20 in light of our decisions in cases construing other statutes which codified justification defenses, such as *State* v. *Havican*, 213 Conn. 593, 569 A.2d 1089 (1990), in which this court examined General Statutes § 53a-19, Connecticut's self-defense statute. The state contends that, when read in light of these decisions, the term "crime of violence" as used in § 53a-20 should be defined narrowly to avoid becoming duplicative. The state also rejects the defendant's claim that juries should be instructed on the elements of those offenses that are considered "crimes of violence," claiming that the defendant has failed to cite any authority for this proposition, and that the language of the statute reflects that the legislature intended to convey that the use of deadly force by an actor should be limited to "situations with the potential for serious violence." Finally, the state also contends that, regardless of any error by the trial court, there is no reasonable possibility that the verdict was affected by the court's failure to instruct the jury on the specific elements of the included crimes, contending that there was no support in the evidence presented at trial to suggest that it would have been objectively reasonable for the defendant to believe that Donald was about to commit the crime of burglary when the defendant fired his revolver. We agree with the state.

The following additional facts and procedural history are relevant to this issue. The defendant requested that the court instruct the jury on several defenses, including defense of premises as defined in § 53a-20.[16] The court agreed to instruct the jury on the defense, but did not give the defendant's requested charge.

In particular, the trial court disagreed with the defendant's proposed instruction regarding the term "crime of violence" as it is used in § 53a-20. Section 53a-20 (2) provides, inter alia, that a person is justified in using deadly force in defense of premises against a criminal trespasser "when he [or she] reasonably believes such to be necessary to prevent an attempt by the trespasser to commit arson or any crime of violence . . . ." The defendant's proposed instruction defined the term to

include the following statutory offenses: murder, as defined in General Statutes § 53a-54a; manslaughter in the first degree, as defined in § 53a-55, manslaughter in the second degree, as defined in General Statutes § 53a-56; assault in the first and second degrees, as defined in General Statutes §§ 53a-59 and 53a-60 respectively, including assault of a victim sixty years or older as defined in General Statutes §§ 53a-59a and 53a-60b; unlawful restraint in the first degree, as defined in General Statutes § 53a-95; and burglary in the first and second degrees, as defined in General Statutes §§ 53a-101 and 53a-102 respectively. In addition to an instruction indicating that the term "crime of violence" encompassed each of these statutory crimes, the defendant requested that the jury be instructed on the specific elements of each referenced statutory offense. Furthermore, with regard to the requested charge regarding burglary as a crime of violence, the defendant asked that the jury be instructed as to offenses such as assault in the third degree. In other words, the defendant requested that the jury be instructed that it could find that Donald had attempted to commit a burglary if they were to conclude that he intended to enter the defendant's home and commit a third degree assault against someone located therein.

The state objected to the defendant's proposed instruction, claiming that it was not a correct statement of law to say that the defendant would have been justified to use deadly force against Donald to prevent an assault in the third degree against someone inside the defendant's home. In addition, the state objected to the defendant's proposed instruction on this issue because it felt that it would be too confusing to the jury to define each statutory offense that conceivably qualified as a "crime of violence."

The trial court agreed with the state, explaining that the common-law definition of "crimes of violence" included only felonies, and, thus, found that the use of deadly force to prevent a third degree assault would not be warranted. The trial court further concluded that there was no evidence to support a finding that the defendant had acted in defense of any person inside his home, nor was there any evidence indicating that Donald was attempting to commit a burglary when he was shot by the defendant. The trial court, however, agreed to include the crime "burglary" in a list of crimes that it gave to the jury as examples of crimes which might qualify as "crimes of violence" for purposes of § 53a-20 "for the jury's edification."[17] The defendant objected to the court's determination that no evidence supported the defendant's contentions that (1) Donald could have been attempting to commit a burglary at the time of the shooting, and (2) the defendant could not have acted in defense of the persons located inside of his home at the time of the shooting. In addition to instructing the jury regarding defense of premises, the

trial court also instructed the jury on self-defense and defense of persons; see General Statutes § 53a-19;[18] the elements of manslaughter in the first degree; see General Statutes § 53a-55; certain requested lesser included forms of homicide, such as manslaughter in the second degree with a firearm; see General Statutes §§ 53a-56 and 53a-56a; and criminally negligent homicide. See General Statutes § 53a-58.

Our resolution of this issue turns on the meaning of the term "crime of violence," as it is used in § 53a-20, which the legislature has, thus far, left undefined. "The issue in this case presents a question of statutory interpretation that requires our plenary review. See *Cogan* v. *Chase Manhattan Auto Financial Corp.*, 276 Conn. 1, 7, 882 A.2d 597 (2005). 'When construing a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case, including the question of whether the language actually does apply. . . . In seeking to determine that meaning, General Statutes § 1-2z directs us first to consider the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered. . . . When a statute is not plain and unambiguous, we also look for interpretive guidance to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter . . . .' " *Caciopoli* v. *Lebowitz*, 309 Conn. 62, 69, 68 A.3d 1150 (2013).

"In discussing the codification of the law of self-defense in § 53a-19, we have said that '[t]he statutes which enumerate the situations where the use of force is justified "attempt to restate the common law. They should be read in the light of their common law background, and the fact that an individual section does not fully state the relevant common law rule, with all its possible applications, exceptions, or implications, should not prevent a court from reading it as incorporating the full body of common law rules relevant thereto." Commission to Revise the Criminal Statutes, Connecticut Penal Code Comments 5-6 (1972).' *State* v. *Shaw*, 185 Conn. 372, 379, 441 A.2d 561 (1981), cert. denied, 454 U.S. 1155, 102 S. Ct. 1027, 71 L. Ed. 2d 312 (1982); *State* v. *Corchado*, 188 Conn. 653, 661–62, 453 A.2d 427 (1982)." *State* v. *Havican*, supra, 213 Conn. 598.

The law of defense of premises was initially codified when the legislature passed the first iteration of Connecticut's Penal Code through the passage of a Public

Act during the 1969 session of the General Assembly. See Public Acts 1969, No. 828, § 20. At that time, the relevant language of the statute provided that a person could use deadly force in defense of premises "when he [or she] reasonably believes it is necessary to prevent an attempt by the trespasser to commit arson . . . ." Public Acts 1969, No. 828, § 20. The term "crime of violence" did not appear until the Penal Code was amended during the 1973 session of the General Assembly when the term was added—without discussion— immediately following the word "arson." See Public Acts 1973, No. 73-639 § 2. Thus, the legislature has not yet precisely defined the term "crime of violence." However, the Commission to Revise the Criminal Statutes, the drafters of the original section, indicated in a comment that the language contained in § 53a-20 "is based on the rule of such cases as *State* v. *Perkins*, [88 Conn. 360, 91 A. 265] (1914). It adds, however, to the traditional common law rule as to the use of deadly force to prevent unlawful entry, the right to prevent such entry to one's 'place of work' as well as one's dwelling. It also makes clear that deadly force is justified to prevent an attempted arson by the trespasser." Commission to Revise the Criminal Statutes, Penal Code Comments, Conn. Gen. Stat. Ann. § 53a-20 (West 2012), commission comment.

In *Perkins*, the defendant offered evidence that she had shot and killed the decedent, her estranged husband, under the following circumstances. "[The decedent] came to the house of the [defendant] and demanded admission, which was refused, and he immediately proceeded to break down the doors of the house, all the while threatening to kill the [defendant]. After he had broken down the storm-porch door, the [defendant] warned him that she had two revolvers, and that if he broke through the double house-doors and attempted to come in she would shoot him. Notwithstanding this warning [the decedent] continued his violent assault upon the double doors, and, as the right-hand door was giving way, he said to the [defendant], with an oath: 'Now I've got you, and I'll cut your guts out.' The [defendant], at the time of his breaking into her house believed that the [decedent] intended to carry out his threats to kill her, and believed that her life was in imminent danger from [decedent] . . . . After the [defendant] had warned the [decedent] that she would shoot if he broke in, and after he had broken down the right half of the house-doors, and was attempting to enter, the [defendant] attempted to fire a revolver at him, but it would not work. She then thought of the shotgun, which was kept [nearby], and fired at [the decedent]. The [defendant] shot the [decedent], as he was breaking into the house, to prevent his entering and taking her life." *State* v. *Perkins*, supra, 88 Conn. 362. Under these circumstances, this court determined that "[t]he evidence and claims of the parties were such as to require

a charge upon the theory that [the defendant's] motive in shooting the [decedent] was to save her own life or to protect herself from bodily harm. An assault on one's house can be regarded as an assault on the person, *within the meaning of the law with reference to self-defense*, where the purpose of the assault is an injury to the person of the occupant or members of his family, to accomplish which the assailant attacks the house in order to reach the inmate. In this connection it is . . . settled, that . . . the [defendant] . . . may meet [an assailant] at the threshold, and prevent him from breaking in, by any means rendered necessary by the exigency; and, *upon the same ground and reason, that one may defend himself from peril of life, or great bodily harm*, by means fatal to the assailant, if rendered necessary by the exigency of the assault." (Emphasis added.) Id., 363–64. This court cited *State* v. *Patterson*, 45 Vt. 308, 320–21 (1873) for that proposition, which contains essentially the same language.

In the present case, the trial court's instruction defined the term "crime of violence" to mean "a crime committed with violence" and provided examples of such crimes, namely "murder, manslaughter, rape, robbery, arson, burglary, assault with the specific intent to cause great bodily harm or assault in which a risk of great bodily harm was created." This instruction is consistent with the sentiment expressed by this court in *Perkins*, which indicated that the common-law understanding of defense of premises authorized the use of deadly force only when the defendant felt that the threat posed by an assailant or invader on the defendant's premises posed at least a risk of great bodily harm. See *State* v. *Perkins*, supra, 88 Conn. 363–64. In addition, this court has previously set out a list of crimes that were considered "crimes of violence" at common law in a case in which a defendant booby-trapped his blacksmith shop to prevent anyone from breaking and entering: "The class of crimes in prevention of which a man may, if necessary, exercise his natural right to repel force by force to the taking of the life of the aggressor, are felonies which are committed by violence and surprise; such as murder, robbery, burglary, arson, breaking a house in the day time with intent to rob, sodomy and rape." (Emphasis omitted.) *State* v. *Moore*, 31 Conn. 479, 483 (1863). This court has previously relied on this list to establish those crimes against which a person could justifiably use deadly force at common law. See *State* v. *Havican*, supra, 213 Conn. 599.

Of course, as the state points out, if a defendant reasonably believed that an actor today were about to commit many of the crimes listed by the court in its "crime of violence" instruction in the present case, then that defendant would already have been authorized to utilize deadly force against the actor in defense of premises pursuant to the other language contained in § 53a-20 that indicates that a person "may use deadly physical

force under such circumstances only (1) in defense of a person as prescribed in section 53a-19 [the defense of persons statute] . . . ." This is because most of these crimes necessarily involve an actor who is using or about to use deadly force or an actor who is inflicting or about to inflict great bodily harm. Thus, the term "crime of violence," as it is used in § 53a-20, must necessarily provide the defendant with the ability to use deadly force against a criminal trespasser when the trespasser is committing some crime that would not be encompassed by the statutory language of § 53a-19. "[I]n construing statutes, we presume that there is a purpose behind every sentence, clause, or phrase used in an act and that no part of a statute is superfluous." (Internal quotation marks omitted.) *State* v. *Havican*, supra, 213 Conn. 600; cf. id., 601 (concluding that terms "serious physical injury" and " 'great bodily harm' " "are two separate grounds that each justify the use of deadly force in self-defense").

We think it is significant that, when codifying this state's law on defense of premises, the legislature expressly listed the crime of arson immediately before the term "crime of violence." Under the doctrine of ejusdem generis, "when a general word or phrase follows a list of specifics, the general word or phrase will be interpreted to include only items of the same class as those listed." Black's Law Dictionary (9th Ed. 2009). Thus, the phrase "crimes of violence" must consist only of those crimes that were considered "violent" at common law, and, within that class of crimes, only those crimes the elements of which do not necessarily involve either the use of deadly force or the infliction of great bodily harm. Of the offenses requested to be included by the defendant, only the offenses of burglary and arson meet both of these prerequisites.

The issue, then, is whether the defendant was entitled to have the jury instructed on the elements of burglary or arson when the trial court instructed the jury as to the meaning of the term "crime of violence." Even if we were to assume that, in a proper case, the defendant might be entitled to an instruction on the elements of these offenses or others that might fall within this definition of the term, we conclude that the defendant was not entitled to an instruction in the present case. Although the defendant has challenged the trial court's definition of the term "crime of violence," and its failure to instruct on the individual elements of each crime to fall within this definition, the defendant has not challenged on appeal the trial court's determination that there was no evidence whatsoever that Donald was attempting a burglary at the time of the incident, nor has the defendant challenged on appeal the trial court's refusal to instruct the jury that the defendant could have been acting in defense of the persons within the defendant's home at the time of the incident.

The situation, in this respect, is not unlike the situation faced by the court in *State* v. *Bryan*, 307 Conn. 823, 60 A.3d 246 (2013). In *Bryan*, the defendant challenged the trial court's refusal to instruct the jury regarding the law on defense of others. Id., 830–31. We concluded that the trial court properly rejected the defendant's request. Id., 836. "[I]n order to submit a defense of others defense to the jury, a defendant must introduce evidence that the defendant reasonably believed [the attacker's] unlawful violence to be imminent or immediate. . . . Under . . . § 53a-19 (a), a person can, under appropriate circumstances, justifiably exercise repeated deadly force if he reasonably believes both that [the] attacker is using or about to use deadly force against [himself or a third person] and that deadly force is necessary to repel such attack. . . . The Connecticut test for the degree of force in self-defense [and the defense of others] is a subjective-objective one. The jury must view the situation from the perspective of the defendant. Section 53a-19 (a) requires, however, that the defendant's belief ultimately must be found to be reasonable. . . . [I]n reviewing the trial court's rejection of the defendant's request for a jury charge on [defense of others], we . . . adopt the version of the facts most favorable to the defendant which the evidence would reasonably support." (Citation omitted; internal quotation marks omitted.) Id., 835–36. Ultimately, we concluded that the instruction was not warranted because "[n]o evidence . . . supports the defendant's contention that at the time he stabbed the victim, it was objectively reasonable for him to believe that it was necessary to do so in order to defend [the third party]." (Emphasis omitted.) Id., 836. As a result, we noted that "even if the jury concluded that the defendant himself believed that the victim represented an imminent threat to [the third party] at the time the defendant stabbed the victim, no reasonable jury could find the defendant's belief to be objectively reasonable. Viewed in the light most favorable to the defendant, the evidence was insufficient to raise a reasonable doubt in the mind of a rational juror as to whether the defendant acted in [the third party's] defense." Id., 838–39.

Here, the trial court's rulings finding a lack of evidence to support inferences that either (1) Donald was attempting to commit a burglary, or (2) the defendant was acting in defense of the persons located inside of his home at the time of the shooting, lead inevitably to the conclusion that no reasonable jury would be able to find that any subjective belief that may have been held by the defendant that Donald was attempting to commit burglary or arson was objectively reasonable.[19] As a result, any error of the trial court in instructing the jury on the elements of these two crimes was harmless beyond a reasonable doubt. Cf. *State* v. *Lemoine*, 256 Conn. 193, 199–200, 770 A.2d 491 (2001) (concluding no

constitutional error in self-defense instruction existed where court did not instruct jury on defendant's duty to retreat, because duty of retreat "not relevant to the . . . case because the state did not argue to the jury that the defendant should have retreated" and ultimately concluding that "[b]ecause the state made no claim that the defendant should have retreated . . . the defendant did not suffer constitutional harm by the trial court's omission of an unnecessary and potentially confusing instruction on the duty to retreat").

In summary, we conclude that the term "crime of violence" as it is used in § 53a-20 does not include those crimes considered to be "crimes of violence" at common law against which the defendant would already have been authorized to defend himself pursuant to the statutory framework laid out in § 53a-19. Instead, the term involves only those offenses which fall within the traditional common-law definition and do not, by their essential elements, necessarily involve the use of deadly force or infliction of great bodily harm. We further conclude that, of those relevant crimes requested to be included by the defendant within the definition of "crime of violence," only the crimes of arson and burglary fall within that definition. Further, we conclude that, on the basis of the evidence before the trial court and its rulings thereon, a reasonable jury could not have found that it would have been objectively reasonable for the defendant to believe that Donald was attempting to commit either of these crimes, and, as a result, any error committed by the trial court in refusing to instruct the jury on the essential elements of those offenses was harmless beyond a reasonable doubt.

The judgment is affirmed.

In this opinion ROGERS, C. J., and PALMER and McDONALD, Js., concurred.

[1] General Statutes § 53a-55a (a) provides in relevant part: "A person is guilty of manslaughter in the first degree with a firearm when he commits manslaughter in the first degree as provided in section 53a-55, and in the commission of such offense he uses, or is armed with and threatens the use of or displays or represents by his words or conduct that he possesses a pistol, revolver, shotgun, machine gun, rifle or other firearm. . . ." We note that, although § 53a-55a was amended by the legislature in 2007; see Public Acts 2007, No. 07-143, § 13; that amendment has no bearing on the merits of this appeal. In the interest of simplicity, we refer to the current revision of the statute.

Manslaughter in the first degree is defined in General Statutes § 53a-55 (a), which provides: "A person is guilty of manslaughter in the first degree when: (1) With intent to cause serious physical injury to another person, he causes the death of such person or of a third person; or (2) with intent to cause the death of another person, he causes the death of such person or of a third person under circumstances which do not constitute murder because he committed the proscribed act or acts under the influence of extreme emotional disturbance, as provided in subsection (a) of section 53a-54a, except that the fact that homicide was committed under the influence of extreme emotional disturbance constitutes a mitigating circumstance reducing murder to manslaughter in the first degree and need not be proved in any prosecution initiated under this subsection; or (3) under circumstances evincing an extreme indifference to human life, he recklessly engages in conduct which creates a grave risk of death to another person, and

thereby causes the death of another person."

[2] The defendant initially appealed to the Appellate Court. That court was not, however, the proper court to consider the defendant's appeal because the present matter involves a conviction for a class A felony, which is subject to a maximum sentence that exceeds twenty years. See General Statutes § 51-199 (b) (3). Consequently, we transferred the defendant's appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-4.

[3] General Statutes § 53a-20 provides: "A person in possession or control of premises, or a person who is licensed or privileged to be in or upon such premises, is justified in using reasonable physical force upon another person when and to the extent that he reasonably believes such to be necessary to prevent or terminate the commission or attempted commission of a criminal trespass by such other person in or upon such premises; but he may use deadly physical force under such circumstances only (1) in defense of a person as prescribed in section 53a-19, or (2) when he reasonably believes such to be necessary to prevent an attempt by the trespasser to commit arson or any crime of violence, or (3) to the extent that he reasonably believes such to be necessary to prevent or terminate an unlawful entry by force into his dwelling as defined in section 53a-100, or place of work, and for the sole purpose of such prevention or termination."

[4] See footnote 2 of this opinion.

[5] We note that the state claims that, by failing to have the jury specify its verdict at the first trial, the defendant waived review of the double jeopardy claim and, following from this, the defendant cannot show that a "clear constitutional violation" has occurred pursuant to *State* v. *Golding*, supra, 213 Conn. 239–40. We do not agree that the defendant's failure to take additional action at the first trial caused him to waive or otherwise fail to preserve his double jeopardy claim. Indeed, as this court noted in *State* v. *Hedge*, 297 Conn. 621, 655 n.14, 1 A.3d 1051 (2010), "the defendant raised his double jeopardy claim in a timely manner; indeed, he did so at the first possible opportunity after learning that the state intended to retry him for the heroin offense." Here, the defendant moved to dismiss the second prosecution on double jeopardy grounds ten days after the state filed its information. Given that the defendant's claimed basis for the double jeopardy clause violation in this case is that the state has subjected him to successive prosecutions for the same offense, there could not actually be a potential double jeopardy issue until the second information was actually filed against the defendant. See, e.g., *Green* v. *United States*, 355 U.S. 184, 187–89, 78 S. Ct. 221, 2 L. Ed. 2d 199 (1957). As we explain subsequently in this opinion, although the defendant's failure to clarify the first jury's verdict does negatively impact his ability to succeed on the merits of his double jeopardy challenge, it has no impact on our ability to review the claimed violation.

[6] The defendant offered the testimony of a chemist "who testified that, although heroin and opium are distinct drugs, heroin is a chemical compound derived from the opiate plant. She further testified that, although heroin can be manufactured synthetically, she would have no way of knowing whether the heroin in the present case was synthetic without examining it." *State* v. *Hedge*, supra, 297 Conn. 664.

[7] Specifically, the "acquittal first" instruction provided is as follows: "[I]f you find the defendant not guilty of the crime of murder . . . you shall then consider the lesser offenses of manslaughter in the first degree with a firearm. If you find the state has failed to prove the elements of manslaughter in the first degree with a firearm beyond a reasonable doubt, then you will consider the lesser included offense of manslaughter in the second degree with a firearm . . . ."

[8] Specifically, we note that the trial court instructed the jury on the elements of both intentional manslaughter in the first degree as it is defined in § 53a-55 (a) (1) and reckless manslaughter in the first degree as it is defined in § 53a-55 (a) (3). We also observe that, initially, the trial court instructed the jury *only* regarding the elements of intentional manslaughter in the first degree. The trial court corrected this instruction, however, to include the elements of both relevant subdivisions of § 53a-55 (a). Neither party has suggested that these events should impact our resolution of this issue.

[9] We note that the state disagrees with the defendant's position, and instead claims that this court's decision in *State* v. *Rodriguez*, supra, 180 Conn. 382, is controlling. We disagree with the state. *Rodriguez* does not stand for the proposition that a person can simultaneously act intentionally and recklessly. Rather, *Rodriguez* stands for the proposition that *the same evidence* may support both mental states and, thus, the state may *charge* the defendant

with offenses that include inconsistent mental states. Id., 404–405. In *Rodriguez*, the defendant was charged with murder and ultimately convicted of the lesser included offense of manslaughter. The defendant argued that "because he was charged with murder, a crime requiring the element of specific intent to cause the death of another, the court's charge on manslaughter in the first and second degrees and criminally negligent homicide, which do not require the same state of mind, violated his right to be informed of the crime he is alleged to have committed." Id., 399. This court upheld the defendant's conviction, and observed that "[w]here the state is faced with a homicide prosecution, it may . . . assume that an accused acted with the most culpable state of mind. But where the evidence is reasonably susceptible of another conclusion, the jury . . . should not be bound by that assumption and forced by its verdict to choose only between the offense with the most culpable state of mind and acquittal. Such a result would limit the jury's function of determining questions of fact and undermine a defendant's right to a trial by jury." (Citation omitted.) Id., 404. *Rodriguez* did not involve a situation, such as the one at issue in *King*, where a defendant had actually been convicted of two offenses with differing mental states. Compare id., 398–99, with *State* v. *King*, supra, 216 Conn. 592–94. Thus, *Rodriguez* is inapplicable to the situation at hand.

[10] We note that *State* v. *Nash*, SC 19265, which was recently argued before this court, will consider the precise issue of whether a person can act both intentionally and recklessly at the same time. We offer no opinion on this issue at this time.

[11] Specifically, the court in *Green* observed: "When given the choice between finding [the defendant] guilty of either first or second degree murder it chose the latter. In this situation the great majority of cases in this country have regarded the jury's verdict as an implicit acquittal on the charge of first degree murder. But the result in this case need not rest alone on the assumption, which we believe legitimate, that the jury for one reason or another acquitted [the defendant] of murder in the first degree. For here, the jury was dismissed without returning any express verdict on that charge and without [the defendant's] consent. Yet it was given a full opportunity to return a verdict and no extraordinary circumstances appeared which prevented it from doing so. Therefore it seems clear, under established principles of former jeopardy, that [the defendant'] jeopardy for first degree murder came to an end when the jury was discharged so that he could not be retried for that offense." (Footnote omitted.) *United States* v. *Green*, supra, 355 u.s.190–91.

[12] We recognize, as the concurrence points out, that cases such as *Garcia* and *Wright* are not entirely apposite to the issue that is presented in this case. Namely, although cases such as *Garcia* and *Wright* both deal with claimed double jeopardy violations resulting from successive prosecutions, the defendants in those cases premised their claims on the seminal United States Supreme Court case *Green* v. *United States*, supra, 355 U.S. 184. See *United States* v. *Garcia*, supra, 938 F.2d 14–15; *State* v. *Wright*, supra, 165 Wash.2d 796–800. In *Green*, as stated previously in this opinion, the acquittal occurs either when a jury returns a verdict on one charge and remains silent as to another, or when the jury is dismissed, in the absence of extraordinary circumstances, without returning a verdict on the charge and without the defendant's consent. See *Green* v. *United States*, supra, 355 U.S. 190–91. In other words, the double jeopardy violation occurs by operation of law because, in delivering its verdict, the jury has terminated the jeopardy faced by the defendant. See id., 181. Just as courts have refused to attach meaning to such a verdict in the context of a claimed implicit acquittal, so too is it difficult to extract much meaning from a general verdict when the issue is determining what a jury "actually decided"; see, e.g., *Dowling* v. *United States*, 493 U.S. 342, 350, 110 S. Ct. 668, 107 L. Ed. 2d 708 (1990); regarding the facts of a case during its deliberations.

[13] We have previously held that this phrase serves to modify the degree of recklessness exhibited by an actor when engaging in criminal behavior. See, e.g., *State* v. *McMahon*, 257 Conn. 544, 552–56, 778 A.2d 847 (2001), cert. denied, 534 U.S. 1130, 122 S. Ct. 1069, 151 L. Ed. 2d 972 (2002).

[14] It is useful to recall that all evidence indicating a defendant's mental state at the time of an offense is entirely circumstantial, and drawn from inferences made by the jury from evidence such as the words or deeds of the defendant at the time of the events in question. See, e.g., *State* v. *Garner*, 270 Conn. 458, 475–76, 853 A.2d 478 (2004).

[15] Indeed, although we do not impose any requirement on either the defendant or the state to clarify a general verdict in a case such as this one, we

observe that the state has at least an equal incentive to the defendant in obtaining a clear verdict. Had the state done so, it would have accomplished two things: (1) the basis on which the jury convicted the defendant would have been clear, preventing the defendant from raising any sort of double jeopardy argument when the defendant was retried for the offense of which he was previously convicted after this court initially set aside that conviction; and (2) the state could have avoided any potential risk of violating the defendant's right against double jeopardy in any subsequent retrial. Indeed, the state, and not the defendant, will always be better able to anticipate and clarify ambiguities that may give rise to future double jeopardy issues, because ultimately it is the state, and not the defendant, who can control whether a double jeopardy issue is ever to occur. This is because precisely what charges are brought against a defendant in any given trial is always an exercise in prosecutorial discretion. See, e.g., *United States* v. *Batchelder*, 442 U.S. 114, 124, 99 S. Ct. 2198, 60 L. Ed. 2d 755 (1979).

[16] General Statutes § 53a-20 provides: "A person in possession or control of premises, or a person who is licensed or privileged to be in or upon such premises, is justified in using reasonable physical force upon another person when and to the extent that he reasonably believes such to be necessary to prevent or terminate the commission or attempted commission of a criminal trespass by such other person in or upon such premises; but he may use deadly physical force under such circumstances only (1) in defense of a person as prescribed in section 53a-19, or (2) when he reasonably believes such to be necessary to prevent an attempt by the trespasser to commit arson or any crime of violence, or (3) to the extent that he reasonably believes such to be necessary to prevent or terminate an unlawful entry by force into his dwelling as defined in section 53a-100, or place of work, and for the sole purpose of such prevention or termination."

General Statutes § 53a-19 provides in relevant part: "(a) Except as provided in subsections (b) and (c) of this section, a person is justified in using reasonable physical force upon another person to defend himself or a third person from what he reasonably believes to be the use or imminent use of physical force, and he may use such degree of force which he reasonably believes to be necessary for such purpose; except that deadly physical force may not be used unless the actor reasonably believes that such other person is (1) using or about to use deadly physical force, or (2) inflicting or about to inflict great bodily harm.

"(b) Notwithstanding the provisions of subsection (a) of this section, a person is not justified in using deadly physical force upon another person if he or she knows that he or she can avoid the necessity of using such force with complete safety (1) by retreating, except that the actor shall not be required to retreat if he or she is in his or her dwelling, as defined in section 53a-100, or place of work and was not the initial aggressor . . . .

"(c) Notwithstanding the provisions of subsection (a) of this section, a person is not justified in using physical force when (1) with intent to cause physical injury or death to another person, he provokes the use of physical force by such other person, or (2) he is the initial aggressor, except that his use of physical force upon another person under such circumstances is justifiable if he withdraws from the encounter and effectively communicates to such other person his intent to do so, but such other person notwithstanding continues or threatens the use of physical force, or (3) the physical force involved was the product of a combat by agreement not specifically authorized by law."

[17] The court's ultimate instruction to the jury regarding the definition of "crime of violence" was as follows: "A crime of violence is a crime committed with violence such as murder, manslaughter, rape, robbery, arson, burglary, assault with the specific intent to cause great bodily harm or assault in which a risk of great bodily harm was created."

[18] With regard to the defense of persons charge, as described previously in this opinion, the court did not instruct the jury that it could find that the defendant had acted in defense of Daniels, Kathryn, or Kathryn's daughter, each of whom were in the defendant's house at the time of the shooting. Instead, the court limited its instruction on defense of persons, instructing the jury that it could find only that the defendant had acted in defense of himself or Gardner, the teenager who Donald had confronted immediately prior to the incident with the defendant.

[19] With regards to the trial court's ruling on the crime of burglary, although the defendant claims that the crime falls within the definition of the term "crime of violence," and that the trial court should have instructed the jury on the elements of that crime in instructing the jury on the statutory definition of that term, the defendant has not challenged the trial court's ruling that the evidence did not support an inference that Donald was attempting to commit

a burglary. The only evidence relied on by the defendant to support his claim that such an instruction was warranted was Donald's "expressions of anger" and threats toward the defendant contained in the defendant's statement to the police, and the fact that, according to the defendant, Donald blocked the defendant's path to the house during the altercation. We conclude that this evidence does not give rise to a reasonable inference that Donald was attempting to commit a burglary at the time that the defendant shot him. Nothing contained in the record suggests that Donald was attempting to unlawfully enter or remain in the defendant's home at the time that he was shot, which is an essential element in the commission of the crime of burglary. See General Statutes §§ 53a-101, 53a-102 and 53a-103. The mere fact that, according to the defendant, Donald blocked the defendant from retreating into his house does not give rise to the inference that Donald intended to enter into the house.

Similarly, we conclude that the trial court's ruling that it was not objectively reasonable for the jury to consider whether the defendant was acting in defense of Daniels, Kathryn, or Kathryn's daughter also rendered it impossible for a reasonable jury to conclude that any subjective belief by the defendant that Donald was attempting to commit arson was objectively reasonable. Although it is not an essential element of the crime of arson to intend harm to the occupants of a building; see, e.g., General Statutes § 53a-111; in this case, any attempt to set fire to or cause an explosion in the defendant's home necessarily would have carried with it the risk of serious physical injury to the occupants therein. Thus, in this case, by concluding that the jury could not consider whether the defendant was acting in defense of the occupants of his house—a ruling that the defendant has not challenged before this court—no reasonable jury could have concluded that, on the present facts, any subjective belief by the defendant that Donald was attempting to commit arson at the time he was shot was objectively reasonable.